# FEDERAL COMMUNICATIONS COMMISSION *v.* NATIONAL CITIZENS COMMITTEE FOR BROADCASTING ET AL.

No. 76–1471. Argued January 16, 1978—Decided June 12, 1978*

---

*Together with No. 76–1521, *Channel Two Television Co. et al.* v. *National Citizens Committee for Broadcasting;* No. 76–1595, *National Association of Broadcasters* v. *Federal Communications Commission et al.;* No. 76–1604, *American Newspaper Publishers Assn.* v. *National Citizens Committee for Broadcasting et al.;* No. 76–1624, *Illinois Broadcasting Co., Inc., et al.* v. *National Citizens Committee for Broadcasting et al.;* and No. 76–1685, *Post Co. et al.* v. *National Citizens Committee for Broadcasting et al.,* also on certiorari to the same court.

MARSHALL, J., delivered the opinion of the Court, in which all other Members joined except BRENNAN, J., who took no part in the consideration or decision of the cases.

*Erwin N. Griswold* argued the cause for petitioners in Nos. 76–1521, 76–1595, 76–1604, 76–1624, and 76–1685. *Ernest W. Jennes* and *Russell H. Carpenter, Jr.,* filed briefs for petitioners in No. 76–1521; *Lee Loevinger, David B. Lytle,* and *Walter A. Smith, Jr.,* filed a brief for petitioner in No. 76–1595; *Arthur*

*B. Hanson, Aloysius B. McCabe,* and *Michael Yourshaw* filed briefs for petitioner in No. 76–1604; *John B. Kenkel* and *William M. Barnard* filed a brief for petitioners in No. 76–1624; and *John H. Midlen* and *John H. Midlen, Jr.,* filed a brief for petitioners in No. 76–1685.

*Daniel M. Armstrong* argued the cause for the Federal Communications Commission, petitioner in No. 76–1471 and a respondent in No. 76–1595. With him on the briefs were *Sheldon M. Guttmann* and *Keith H. Fagan.*

*Deputy Solicitor General Wallace* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Assistant Attorney General Shenefield, Frank H. Easterbrook, Barry Grossman, Robert B. Nicholson,* and *Bruce E. Fein.*

*Charles M. Firestone* argued the cause for National Citizens Committee for Broadcasting, a respondent in Nos. 76–1471, 76–1521, 76–1604, 76–1624, and 76–1685. With him on the brief were *Edward J. Kuhlmann* and *Nolan A. Bowie.*

*James A. McKenna, Jr.,* and *Thomas N. Frohock* filed a brief for American Broadcasting Companies, Inc., a respondent in Nos. 76–1471, 76–1521, 76–1604, 76–1624, and 76–1685.

*R. Russell Eagan, Robert A. Beizer, John P. Southmayd, Thomas H. Wall, Alan C. Campbell, Richard Hildreth,* and *James E. Greeley* filed a brief for Gray Communications Systems, Inc., et al., respondents in Nos. 76–1471, 76–1521, 76–1595, 76–1604, 76–1624, and 76–1685.

*Paul Dobin* and *Ian D. Volner* filed a brief in No. 76–1471 for Louisiana Television Broadcasting Corp., as respondent under this Court's Rule 21 (4).†

---

†Briefs of *amici curiae* urging reversal were filed by *Mr. Griswold* and *Victor E. Ferrall, Jr.,* for Dispatch Printing Co. et al., and by *J. Roger Wollenberg, Timothy N. Black, John F. Cooney,* and *John E. Flick* for Times Mirror Co.

Briefs of *amici curiae* urging affirmance were filed by the National

Mr. Justice Marshall delivered the opinion of the Court.

At issue in these cases are Federal Communications Commission regulations governing the permissibility of common ownership of a radio or television broadcast station and a daily newspaper located in the same community. *Rules Relating to Multiple Ownership of Standard, FM, and Television Broadcast Stations, Second Report and Order,* 50 F. C. C. 2d 1046 (1975) (hereinafter cited as Order), as amended upon reconsideration, 53 F. C. C. 2d 589 (1975), codified in 47 CFR §§ 73.35, 73.240, 73.636 (1976). The regulations, adopted after a lengthy rulemaking proceeding, prospectively bar formation or transfer of co-located newspaper-broadcast combinations. Existing combinations are generally permitted to continue in operation. However, in communities in which there is common ownership of the only daily newspaper and the only broadcast station, or (where there is more than one broadcast station) of the only daily newspaper and the only television station, divestiture of either the newspaper or the broadcast station is required within five years, unless grounds for waiver are demonstrated.

The questions for decision are whether these regulations either exceed the Commission's authority under the Communications Act of 1934, 48 Stat. 1064, as amended, 47 U. S. C. § 151 *et seq.* (1970 ed. and Supp. V), or violate the First or Fifth Amendment rights of newspaper owners; and whether the lines drawn by the Commission between new and existing newspaper-broadcast combinations, and between existing combinations subject to divestiture and those allowed to continue in operation, are arbitrary or capricious within the meaning of § 10 (e) of the Administrative Procedure Act, 5 U. S. C. § 706 (2) (A) (1976 ed.). For the reasons set forth below, we sustain the regulations in their entirety.

Emergency Civil Liberties Foundation, and by *Earle K. Moore* for the Office of Communication of the United Church of Christ et al.

I

A

Under the regulatory scheme established by the Radio Act of 1927, 44 Stat. 1162, and continued in the Communications Act of 1934, no television or radio broadcast station may operate without a license granted by the Federal Communications Commission. 47 U. S. C. § 301. Licensees who wish to continue broadcasting must apply for renewal of their licenses every three years, and the Commission may grant an initial license or a renewal only if it finds that the public interest, convenience, and necessity will be served thereby. §§ 307 (a), (d), 308 (a), 309 (a), (d).

In setting its licensing policies, the Commission has long acted on the theory that diversification of mass media ownership serves the public interest by promoting diversity of program and service viewpoints, as well as by preventing undue concentration of economic power. See, *e. g., Multiple Ownership of Standard, FM and Television Broadcast Stations,* 45 F. C. C. 1476, 1476–1477 (1964). This perception of the public interest has been implemented over the years by a series of regulations imposing increasingly stringent restrictions on multiple ownership of broadcast stations. In the early 1940's, the Commission promulgated rules prohibiting ownership or control of more than one station in the same broadcast service (AM radio, FM radio, or television) in the same community.[1]

----

[1] See Multiple Ownership of Standard Broadcast Stations (AM radio), 8 Fed. Reg. 16065 (1943); Rules and Regulations Governing Commercial Television Broadcast Stations, § 4.226, 6 Fed. Reg. 2284, 2284–2285 (1941); Rules Governing Standard and High Frequency Broadcast Stations (FM radio), § 3.228 (a), 5 Fed. Reg. 2382, 2384 (1940). In 1941 the Commission issued "chain broadcasting" regulations that, among other things, prohibited any organization from operating more than one broadcast network and barred any network from owning more than one standard broadcast station in the same community. See *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 193, 206–208 (1943). In 1964 the Commission tightened its multiple-ownership regulations so as to prohibit

In 1953, limitations were placed on the total number of stations in each service a person or entity may own or control.[2] And in 1970, the Commission adopted regulations prohibiting, on a prospective basis, common ownership of a VHF television station and any radio station serving the same market.[3]

More generally, "[d]iversification of control of the media of mass communications" has been viewed by the Commission as "a factor of primary significance" in determining who, among competing applicants in a comparative proceeding, should receive the initial license for a particular broadcast facility. *Policy Statement on Comparative Broadcast Hearings,* 1 F. C. C. 2d 393, 394–395 (1965) (italics omitted). Thus, prior to adoption of the regulations at issue here, the fact that an applicant for an initial license published a newspaper in the community to be served by the broadcast station was taken into account on a case-by-case basis, and resulted in some instances in awards of licenses to competing applicants.[4]

---

common ownership of any stations in the same broadcast service that have overlaps in certain service contours. See *Multiple Ownership of Standard, FM and Television Broadcast Stations,* 45 F. C. C. 1476 (1964).

[2] See *Multiple Ownership of AM, FM and Television Broadcast Stations,* 18 F. C. C. 288 (1953). The regulations limited each person to a total of seven AM radio stations, seven FM radio stations, and five VHF television stations. In *United States* v. *Storer Broadcasting Co.,* 351 U. S. 192 (1956), the regulations were upheld by this Court.

[3] *Multiple Ownership of Standard, FM and Television Broadcast Stations,* 22 F. C. C. 2d 306 (1970), as modified, 28 F. C. C. 2d 662 (1971). No divestiture of existing television-radio combinations was required. The regulations also provided that license applications involving common ownership of a UHF television station and a radio station serving the same market would be considered on a case-by-case basis and that common ownership of AM and FM radio stations serving the same market would be permitted.

[4] See, *e. g., McClatchy Broadcasting Co.* v. *FCC,* 99 U. S. App. D. C. 195, 239 F. 2d 15 (1956), cert. denied, 353 U. S. 918 (1957); *Scripps-Howard Radio, Inc.* v. *FCC,* 89 U. S. App. D. C. 13, 189 F. 2d 677, cert. denied, 342 U. S. 830 (1951).

In the early 1940's, the Commission considered adopting rules barring

Diversification of ownership has not been the sole consideration thought relevant to the public interest, however. The Commission's other, and sometimes conflicting, goal has been to ensure "the best practicable service to the public." *Id.,* at 394. To achieve this goal, the Commission has weighed factors such as the anticipated contribution of the owner to station operations, the proposed program service, and the past broadcast record of the applicant—in addition to diversification of ownership—in making initial comparative licensing decisions. See *id.,* at 395–400. Moreover, the Commission has given considerable weight to a policy of avoiding undue disruption of existing service.[5] As a result, newspaper own-

---

common ownership of newspapers and radio stations, see Order Nos. 79 and 79–A, 6 Fed. Reg. 1580, 3302 (1941), but, after an extensive rulemaking proceeding, decided to deal with the problem on an ad hoc basis, Newspaper Ownership of Radio Stations, Notice of Dismissal of Proceeding, 9 Fed. Reg. 702 (1944).

[5] The Commission's policy with respect to license renewals has undergone some evolution, but the general practice has been to place considerable weight on the incumbent's past performance and to grant renewal—even where the incumbent is challenged by a competing applicant—if the incumbent has rendered meritorious service. In 1970 the Commission adopted a policy statement purporting to codify its previous practice as to comparative license renewal hearings. *Policy Statement Concerning Comparative Hearings Involving Regular Renewal Applicants,* 22 F. C. C. 2d 424. Citing considerations of predictability and stability, the statement adopted the policy that, where an incumbent's program service "has been substantially attuned to meeting the needs and interests of its area," the incumbent would be granted an automatic preference over any new applicant without consideration of other factors—including diversification of ownership—that are taken into account in initial licensing decisions. *Id.,* at 425. This policy statement was overturned on appeal, *Citizens Communications Center* v. *FCC,* 145 U. S. App. D. C. 32, 447 F. 2d 1201 (1971), on the ground that the Commission was required to hold full hearings at which all relevant public-interest factors would be considered. The court agreed with the Commission, however, that "incumbent licensees should be judged primarily on their records of past performance." *Id.,* at 44, 447 F. 2d, at 1213. The court stated further that *"superior* performance [by an incumbent] should be a plus of major significance in renewal

ers in many instances have been able to acquire broadcast licenses for stations serving the same communities as their newspapers, and the Commission has repeatedly renewed such licenses on findings that continuation of the service offered by the common owner would serve the public interest. See Order, at 1066–1067, 1074–1075.

## B

Against this background, the Commission began the instant rulemaking proceeding in 1970 to consider the need for a more restrictive policy toward newspaper ownership of radio and television broadcast stations. Further Notice of Proposed Rulemaking (Docket No. 18110), 22 F. C. C. 2d 339 (1970).[6] Citing studies showing the dominant role of television stations and daily newspapers as sources of local news and other information, *id.*, at 346; see *id.*, at 344–346,[7] the notice of

proceedings." *Ibid.* (emphasis in original). After the instant regulations were promulgated, the Commission adopted a new policy statement in response to the *Citizens Communications* decision, returning to a case-by-case approach in which all factors would be considered, but in which the central factor would still be the past performance of the incumbent. *In re Formulation of Policies Relating to the Broadcast Renewal Applicant, Stemming from the Comparative Hearing Process*, 66 F. C. C. 2d 419 (1977), pet. for review pending *sub nom. National Black Media Coalition* v. *FCC*, No. 77–1500 (CADC).

[6] This proceeding was a continuation of the earlier proceeding that had resulted in adoption of regulations barring new licensing of radio-VHF television combinations in the same market, while permitting AM–FM combinations and consigning radio-UHF television combinations to case-by-case treatment. See *supra*, at 781, and n. 3. In addition to the proposal with respect to common ownership of newspapers and broadcast stations, the Further Notice of Proposed Rulemaking suggested the possibility of prohibiting AM–FM combinations and requiring divestiture of existing television-radio combinations serving the same market, but these latter proposals were not adopted and they are not at issue here. See Order, at 1052–1055.

[7] The studies generally showed that radio was the third most important source of news, ranking ahead of magazines and other periodicals. See 22 F. C. C. 2d, at 345.

rulemaking proposed adoption of regulations that would eliminate all newspaper-broadcast combinations serving the same market, by prospectively banning formation or transfer of such combinations and requiring dissolution of all existing combinations within five years, *id.*, at 346. The Commission suggested that the proposed regulations would serve "the purpose of promoting competition among the mass media involved, and maximizing diversification of service sources and viewpoints." *Ibid.* At the same time, however, the Commission expressed "substantial concern" about the disruption of service that might result from divestiture of existing combinations. *Id.*, at 348. Comments were invited on all aspects of the proposed rules.

The notice of rulemaking generated a considerable response. Nearly 200 parties, including the Antitrust Division of the Justice Department, various broadcast and newspaper interests, public interest groups, and academic and research entities, filed comments on the proposed rules. In addition, a number of studies were submitted, dealing with the effects of newspaper-broadcast cross-ownership on competition and station performance, the economic consequences of divestiture, and the degree of diversity present in the mass media. In March 1974, the Commission requested further comments directed primarily to the core problem of newspaper-television station cross-ownership, Memorandum Opinion and Order (Docket No. 18110), 47 F. C. C. 2d 97 (1974), and close to 50 sets of additional comments were filed. In July 1974, the Commission held three days of oral argument, at which all parties who requested time were allowed to speak.

The regulations at issue here were promulgated and explained in a lengthy report and order released by the Commission on January 31, 1975. The Commission concluded, first, that it had statutory authority to issue the regulations under the Communications Act, Order, at 1048, citing 47 U. S. C. §§ 2 (a), 4 (i), 4 (j), 301, 303, 309 (a), and that the

regulations were valid under the First and Fifth Amendments to the Constitution, Order, at 1050–1051. It observed that "[t]he term public interest encompasses many factors including 'the widest possible dissemination of information from diverse and antagonistic sources.'" Order, at 1048, quoting *Associated Press* v. *United States*, 326 U. S. 1, 20 (1945), and that "ownership carries with it the power to select, to edit, and to choose the methods, manner and emphasis of presentation," Order, at 1050. The Order further explained that the prospective ban on creation of co-located newspaper-broadcast combinations was grounded primarily in First Amendment concerns, while the divestiture regulations were based on both First Amendment and antitrust policies. *Id.*, at 1049. In addition, the Commission rejected the suggestion that it lacked the power to order divestiture, reasoning that the statutory requirement of license renewal every three years necessarily implied authority to order divestiture over a five-year period. *Id.*, at 1052.

After reviewing the comments and studies submitted by the various parties during the course of the proceeding, the Commission then turned to an explanation of the regulations and the justifications for their adoption. The prospective rules, barring formation of new broadcast-newspaper combinations in the same market, as well as transfers of existing combinations to new owners, were adopted without change from the proposal set forth in the notice of rulemaking.[8] While recog-

---

[8] The rules prohibit a newspaper owner from acquiring a license for a co-located broadcast station, either by transfer or by original licensing; if a broadcast licensee acquires a daily newspaper in the same market, it must dispose of its license within a year or by the time of its next renewal date, whichever comes later. See Order, at 1074–1076, 1099–1107. Noncommercial educational television stations and college newspapers are not included within the scope of the rules. 47 CFR § 73.636, and n. 10 (1976). For purposes of the rules, ownership is defined to include operation or control, § 73.636 n. 1; a "daily newspaper" is defined as "one which is published four or more days per week, which is in the English language

nizing the pioneering contributions of newspaper owners to the broadcast industry, the Commission concluded that changed circumstances made it possible, and necessary, for all new licensing of broadcast stations to "be expected to add to local diversity." *Id.*, at 1075.[9] In reaching this conclusion, the Commission did not find that existing co-located newspaper-broadcast combinations had not served the public interest, or that such combinations necessarily "spea[k] with one voice" or are harmful to competition. *Id.*, at 1085, 1089. In the Commission's view, the conflicting studies submitted by the parties concerning the effects of newspaper ownership on competition and station performance were inconclusive, and no pattern of specific abuses by existing cross-owners was demonstrated. See *id.*, at 1072–1073, 1085, 1089. The prospective rules were justified, instead, by reference to the Commission's policy of promoting diversification of ownership: Increases in diversification of ownership would possibly result in enhanced diversity of viewpoints, and, given the absence of persuasive countervailing considerations, "even a small gain in diversity" was "worth pursuing." *Id.*, at 1076, 1080 n. 30.

With respect to the proposed across-the-board divestiture requirement, however, the Commission concluded that "a mere hoped-for gain in diversity" was not a sufficient justification. *Id.*, at 1078. Characterizing the divestiture issues as "the most difficult" presented in the proceeding, the Order explained that the proposed rules, while correctly recognizing the central importance of diversity considerations, "may have

and which is circulated generally in the community of publication," § 73.636 n. 10; and a broadcast station is considered to serve the same community as a newspaper if a specified service contour of the station— "Grade A" for television, 2 mV/m for AM, and 1 mV/m for FM— encompasses the city in which the newspaper is published, Order, at 1075.

[9] The Commission did provide, however, for waiver of the prospective ban in exceptional circumstances. See Order, at 1076 n. 24, 1077; Memorandum Opinion and Order (Docket No. 18110), 53 F. C. C. 2d 589, 591, 592 (1975).

given too little weight to the consequences which could be expected to attend a focus on the abstract goal alone." *Ibid.* Forced dissolution would promote diversity, but it would also cause "disruption for the industry and hardship for individual owners," "resulting in losses or diminution of service to the public." *Id.,* at 1078, 1080.

The Commission concluded that in light of these counter-vailing considerations divestiture was warranted only in "the most egregious cases," which it identified as those in which a newspaper-broadcast combination has an "effective monopoly" in the local "marketplace of ideas as well as economically." *Id.,* at 1080–1081. The Commission recognized that any standards for defining which combinations fell within that category would necessarily be arbitrary to some degree, but "[a] choice had to be made." *Id.,* at 1080. It thus decided to require divestiture only where there was common ownership of the sole daily newspaper published in a community and either (1) the sole broadcast station providing that entire community with a clear signal, or (2) the sole television station encompassing the entire community with a clear signal. *Id.,* at 1080–1084.[10]

---

[10] Radio and television stations are treated the same under the regulations to the extent that, if there is only one broadcast station serving a community—regardless of whether it is a radio or television station—common ownership of it and a co-located daily newspaper is barred. On the other hand, radio and television stations are given different weight to the extent that the presence of a radio station does not exempt a newspaper-television combination from divestiture, whereas the presence of a television station does exempt a newspaper-radio combination. The latter difference in treatment was explained on the ground that "[r]ealistically, a radio station cannot be considered the equal of either the paper or the television station in any sense, least of all in terms of being a source for news or for being the medium turned to for discussion of matters of local concern." Order, at 1083. The Commission also explained that the regulations did not take into account the presence of magazines and other periodicals, or out-of-town radio or television stations not encompassing the entire community with a clear signal, since—aside from their often small market share—these

The Order identified 8 television-newspaper and 10 radio-newspaper combinations meeting the divestiture criteria. *Id.*, at 1085, 1098. Waivers of the divestiture requirement were granted *sua sponte* to 1 television and 1 radio combination, leaving a total of 16 stations subject to divestiture. The Commission explained that waiver requests would be entertained in the latter cases,[11] but, absent waiver, either the newspaper or the broadcast station would have to be divested by January 1, 1980. *Id.*, at 1084–1086.[12]

---

sources could not be depended upon for coverage of local issues. See *id.*, at 1081–1082.

[11] While noting that the Commission "would not be favorably inclined to grant any request premised on views rejected when the rule was adopted," the Order stated that temporary or permanent waivers might be granted if the common owner were unable to sell his station or could sell it only at an artificially depressed price; if it could be shown that separate ownership of the newspaper and the broadcast station "cannot be supported in the locality"; or, more generally, if the underlying purposes of the divestiture rule "would be better served by continuation of the current ownership pattern." *Id.*, at 1085.

[12] As to existing newspaper-broadcast combinations not subject to the divestiture requirement, the Commission indicated that, within certain limitations, issues relating to concentration of ownership would continue to be considered on a case-by-case basis in the context of license renewal proceedings. Thus, while making clear the Commission's view that renewal proceedings were not a proper occasion for any *"overall* restructuring" of the broadcast industry, the Order stated that diversification of ownership would remain a relevant consideration in renewal proceedings in which common owners were challenged by competing applicants. *Id.*, at 1088 (emphasis in original); see *id.*, at 1087–1089; n. 5, *supra*. The Order suggested, moreover, that where a petition to deny renewal is filed, but no competing applicant steps forward, the renewal application would be set for hearing if a sufficient showing were made of specific abuses by a common owner, or of economic monopolization of the sort that would violate the Sherman Act. Order, at 1080 n. 29, 1088.

The Order does not make clear the extent to which hearings will be available on petitions to deny renewal that do not allege specific abuses or economic monopolization. Counsel for the Commission informs us, however, that the Order was intended to "limi[t] such challengers only to the

On petitions for reconsideration, the Commission reaffirmed the rules in all material respects. Memorandum Opinion and Order (Docket No. 18110), 53 F. C. C. 2d 589 (1975).

## C

Various parties—including the National Citizens Committee for Broadcasting (NCCB), the National Association of Broadcasters (NAB), the American Newspaper Publishers Association (ANPA), and several broadcast licensees subject to the divestiture requirement—petitioned for review of the regulations in the United States Court of Appeals for the District of Columbia Circuit, pursuant to 47 U. S. C. § 402 (a) and 28 U. S. C. §§ 2342 (1), 2343 (1970 ed. and Supp. V). Numerous other parties intervened, and the United States— represented by the Justice Department—was made a respondent pursuant to 28 U. S. C. §§ 2344, 2348. NAB, ANPA, and the broadcast licensees subject to divestiture argued that the regulations went too far in restricting cross-ownership of newspapers and broadcast stations; NCCB and the Justice Department contended that the regulations did not go far enough and that the Commission inadequately justified its decision not to order divestiture on a more widespread basis.

Agreeing substantially with NCCB and the Justice Department, the Court of Appeals affirmed the prospective ban on new licensing of co-located newspaper-broadcast combinations, but vacated the limited divestiture rules, and ordered the Commission to adopt regulations requiring dissolution of all existing combinations that did not qualify for a waiver under the procedure outlined in the Order. 181 U. S. App. D. C. 1, 555 F. 2d 938 (1977); see n. 11, *supra.* The court held, first, that the prospective ban was a reasonable means of furthering

---

extent that [the Commission] will not permit them to re-argue in an adjudicatory setting the question already decided in this rulemaking, *i. e.,* in what circumstances is the continued existence of co-located newspaper-broadcast combinations *per se* undesirable." Reply Brief for Petitioner in No. 76–1471, p. 8; see n. 13, *infra.*

"the highly valued goal of diversity" in the mass media, 181 U. S. App. D. C., at 17, 555 F. 2d, at 954, and was therefore not without a rational basis. The court concluded further that, since the Commission "explained why it considers diversity to be a factor of exceptional importance," and since the Commission's goal of promoting diversification of mass media ownership was strongly supported by First Amendment and antitrust policies, it was not arbitrary for the prospective rules to be "based on [the diversity] factor to the exclusion of others customarily relied on by the Commission." *Id.*, at 13 n. 33, 555 F. 2d, at 950 n. 33; see *id.*, at 11–12, 555 F. 2d, at 948–949.

The court also held that the prospective rules did not exceed the Commission's authority under the Communications Act. The court reasoned that the public interest standard of the Act permitted, and indeed required, the Commission to consider diversification of mass media ownership in making its licensing decisions, and that the Commission's general rulemaking authority under 47 U. S. C. §§ 303 (r) and 154 (i) allowed the Commission to adopt reasonable license qualifications implementing the public-interest standard. 181 U. S. App. D. C., at 14–15, 555 F. 2d, at 951–952. The court concluded, moreover, that since the prospective ban was designed to "increas[e] the number of media voices in the community," and not to restrict or control the content of free speech, the ban would not violate the First Amendment rights of newspaper owners. *Id.*, at 16–17, 555 F. 2d, at 953–954.

After affirming the prospective rules, the Court of Appeals invalidated the limited divestiture requirement as arbitrary and capricious within the meaning of § 10 (e) of the Administrative Procedure Act (APA), 5 U. S. C. § 706 (2)(A) (1976 ed.). The court's primary holding was that the Commission lacked a rational basis for "grandfathering" most existing combinations while banning all new combinations. The court reasoned that the Commission's own diversification policy, as

reinforced by First Amendment policies and the Commission's statutory obligation to "encourage the larger and more effective use of radio in the public interest," 47 U. S. C. § 303 (g), required the Commission to adopt a "presumption" that stations owned by co-located newspapers "do not serve the public interest," 181 U. S. App. D. C., at 25–26, 555 F. 2d, at 962–963. The court observed that, in the absence of countervailing policies, this "presumption" would have dictated adoption of an across-the-board divestiture requirement, subject only to waiver "in those cases where the evidence clearly discloses that cross-ownership is in the public interest." *Id.*, at 29, 555 F. 2d, at 966. The countervailing policies relied on by the Commission in its decision were, in the court's view, "lesser policies" which had not been given as much weight in the past as its diversification policy. *Id.*, at 28, 555 F. 2d, at 965. And "the record [did] not disclose the extent to which divestiture would actually threaten these [other policies]." *Ibid.* The court concluded, therefore, that it was irrational for the Commission not to give controlling weight to its diversification policy and thus to extend the divestiture requirement to all existing combinations.[13]

The Court of Appeals held further that, even assuming a difference in treatment between new and existing combina-

---

[13] The Court of Appeals apparently believed that, under the terms of the Order, future petitions to deny license renewal to existing cross-owners could be set for hearing only if they alleged economic monopolization, and not if they alleged specific programming abuses. See 181 U. S. App. D. C., at 29 n. 108, 555 F. 2d, at 966 n. 108. On the basis of this assumption, the court held that the standards for petitions to deny were unreasonable. Since we do not read the Order as foreclosing the possibility of a hearing upon a claim of specific abuses, and since the Commission itself is apparently of the view that the only issue foreclosed in petitions to deny is the question of whether newspaper-broadcast ownership is *per se* undesirable, see n. 12, *supra*, we cannot say that the Order itself unreasonably limits the availability of petitions to deny renewal. The reasonableness of the Commission's actions on particular petitions to deny filed subsequent to the Order is, of course, not before us at this time.

tions was justifiable, the Commission lacked a rational basis for requiring divestiture in the 16 "egregious" cases while allowing the remainder of the existing combinations to continue in operation. The court suggested that "limiting divestiture to small markets of 'absolute monopoly' squanders the opportunity where divestiture might do the most good," since "[d]ivestiture . . . may be more useful in the larger markets." *Id.,* at 29, 555 F. 2d, at 966. The court further observed that the record "[did] not support the conclusion that divestiture would be more harmful in the grandfathered markets than in the 16 affected markets," nor did it demonstrate that the need for divestiture was stronger in those 16 markets. *Ibid.* On the latter point, the court noted that, "[a]lthough the affected markets contain fewer voices, the amount of diversity in communities with additional independent voices may in fact be no greater." *Ibid.*

The Commission, NAB, ANPA, and several cross-owners who had been intervenors below, and whose licenses had been grandfathered under the Commission's rules but were subject to divestiture under the Court of Appeals' decision, petitioned this Court for review.[14] We granted certiorari, 434 U. S. 815 (1977), and we now affirm the judgment of the Court of Appeals insofar as it upholds the prospective ban and reverse the judgment insofar as it vacates the limited divestiture requirement.[15]

---

[14] Upon motion of the Commission the Court of Appeals temporarily stayed its mandate—insofar as it overturned the Commission's limited divestiture requirement—pending the filing of a petition for certiorari by the Commission. 181 U. S. App. D. C. 30, 555 F. 2d 967 (1977). The Commission filed its petition for certiorari within the time allotted by the Court of Appeals, and thus the stay has remained in effect. See 28 U. S. C. § 2101 (f); Fed. Rule App. Proc. 41 (b).

[15] Several of the petitioners contend that the Court of Appeals exceeded the proper role of a reviewing court by directing the Commission to adopt a rule requiring divestiture of all existing combinations, rather than allowing the Commission to reconsider its decision and formulate its own approach

## II

Petitioners NAB and ANPA contend that the regulations promulgated by the Commission exceed its statutory rulemaking authority and violate the constitutional rights of newspaper owners. We turn first to the statutory, and then to the constitutional, issues.

### A

### (1)

Section 303 (r) of the Communications Act, 47 U. S. C. § 303 (r), provides that "the Commission from time to time, as public convenience, interest, or necessity requires, shall . . . [m]ake such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of [the Act]." See also 47 U. S. C. §154 (i). As the Court of Appeals recognized, 181 U. S. App. D. C., at 14, 555 F. 2d, at 951, it is now well established that this general rulemaking authority supplies a statutory basis for the Commission to issue regulations codifying its view of the public-interest licensing standard, so long as that view is based on consideration of permissible factors and is otherwise reasonable. If a license applicant does not qualify under standards set forth in such regulations, and does not proffer sufficient grounds for waiver or change of those standards, the Commission may deny the application without further inquiry. See *United States* v. *Storer Broadcasting Co.,*

---

in light of the legal principles set forth by the court. Petitioners cite well-established authority to the effect that, absent extraordinary circumstances, "the function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the Commission for reconsideration." *FPC* v. *Idaho Power Co.,* 344 U. S. 17, 20 (1952); accord, *NLRB* v. *Food Store Employees,* 417 U. S. 1, 9–10 (1974); *South Prairie Constr. Co.* v. *Operating Engineers,* 425 U. S. 800, 805–806 (1976). In light of our disposition of these cases, we need not decide whether the Court of Appeals was justified in departing from the latter course of action.

351 U. S. 192 (1956); *National Broadcasting Co.* v. *United States,* 319 U. S. 190 (1943).

This Court has specifically upheld this rulemaking authority in the context of regulations based on the Commission's policy of promoting diversification of ownership. In *United States* v. *Storer Broadcasting Co., supra,* we sustained the portion of the Commission's multiple-ownership rules placing limitations on the total number of stations in each broadcast service a person may own or control. See n. 2, *supra.* And in *National Broadcasting Co.* v. *United States, supra,* we affirmed regulations that, *inter alia,* prohibited broadcast networks from owning more than one AM radio station in the same community, and from owning " 'any standard broadcast station in any locality where the existing standard broadcast stations are so few or of such unequal desirability . . . that competition would be substantially restrained by such licensing.' " See 319 U. S., at 206–208; n. 1, *supra.*

Petitioner NAB attempts to distinguish these cases on the ground that they involved efforts to increase diversification within the boundaries of the broadcasting industry itself, whereas the instant regulations are concerned with diversification of ownership in the mass communications media as a whole. NAB contends that, since the Act confers jurisdiction on the Commission only to regulate "communication by wire or radio," 47 U. S. C. § 152 (a), it is impermissible for the Commission to use its licensing authority with respect to broadcasting to promote diversity in an overall communications market which includes, but is not limited to, the broadcasting industry.

This argument undersells the Commission's power to regulate broadcasting in the "public interest." In making initial licensing decisions between competing applicants, the Commission has long given "primary significance" to "diversification of control of the media of mass communications," and has denied licenses to newspaper owners on the basis of this policy

in appropriate cases. See *supra,* at 781, and n. 4. As we have discussed on several occasions, see, *e. g., National Broadcasting Co.* v. *United States, supra,* at 210–218; *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 375–377, 387–388 (1969), the physical scarcity of broadcast frequencies, as well as problems of interference between broadcast signals, led Congress to delegate broad authority to the Commission to allocate broadcast licenses in the "public interest." And "[t]he avowed aim of the Communications Act of 1934 was to secure the maximum benefits of radio to all the people of the United States." *National Broadcasting Co.* v. *United States, supra,* at 217. It was not inconsistent with the statutory scheme, therefore, for the Commission to conclude that the maximum benefit to the "public interest" would follow from allocation of broadcast licenses so as to promote diversification of the mass media as a whole.

Our past decisions have recognized, moreover, that the First Amendment and antitrust values underlying the Commission's diversification policy may properly be considered by the Commission in determining where the public interest lies. "[T]he 'public interest' standard necessarily invites reference to First Amendment principles," *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 122 (1973), and, in particular, to the First Amendment goal of achieving "the widest possible dissemination of information from diverse and antagonistic sources," *Associated Press* v. *United States,* 326 U. S., at 20. See *Red Lion Broadcasting Co.* v. *FCC, supra,* at 385, 390. See also *United States* v. *Midwest Video Corp.,* 406 U. S. 649, 667–669, and n. 27 (1972) (plurality opinion). And, while the Commission does not have power to enforce the antitrust laws as such, it is permitted to take antitrust policies into account in making licensing decisions pursuant to the public-interest standard. See, *e. g., United States* v. *Radio Corp. of America,* 358 U. S. 334,

351 (1959); *National Broadcasting Co.* v. *United States, supra,* at 222-224. Indeed we have noted, albeit in dictum:

> "[I]n a given case the Commission might find that antitrust considerations alone would keep the statutory standard from being met, as when the publisher of the sole newspaper in an area applies for a license for the only available radio and television facilities, which, if granted, would give him a monopoly of that area's major media of mass communication." *United States* v. *Radio Corp. of America, supra,* at 351-352.

### (2)

It is thus clear that the regulations at issue are based on permissible public-interest goals and, so long as the regulations are not an unreasonable means for seeking to achieve these goals, they fall within the general rulemaking authority recognized in the *Storer Broadcasting* and *National Broadcasting* cases. Petitioner ANPA contends that the prospective rules are unreasonable in two respects: [16] first, the rulemaking record did not conclusively establish that prohibiting common ownership of co-located newspapers and broadcast stations would in fact lead to increases in the diversity of viewpoints among local communications media; and second, the regulations were based on the diversification factor to the exclusion of other service factors considered in the past by the Commission in making initial licensing decisions regarding newspaper owners, see *supra,* at 782. With respect to the first point, we agree with the Court of Appeals that, notwithstanding the inconclusiveness of the rulemaking record, the Commission acted rationally in finding that diversification of ownership would enhance the possibility of achieving greater diversity of viewpoints. As the Court of Appeals observed, "[d]iversity and its effects are . . . elusive concepts, not easily defined let

---

[16] The rationality of the limited divestiture requirement is discussed in Part III, *infra.*

alone measured without making qualitative judgments objectionable on both policy and First Amendment grounds." 181 U. S. App. D. C., at 24, 555 F. 2d, at 961. Moreover, evidence of specific abuses by common owners is difficult to compile; "the possible benefits of competition do not lend themselves to detailed forecast." *FCC* v. *RCA Communications, Inc.*, 346 U. S. 86, 96 (1953). In these circumstances, the Commission was entitled to rely on its judgment, based on experience, that "it is unrealistic to expect true diversity from a commonly owned station-newspaper combination. The divergency of their viewpoints cannot be expected to be the same as if they were antagonistically run." Order, at 1079–1080; see 181 U. S. App. D. C., at 25, 555 F. 2d, at 962.

As to the Commission's decision to give controlling weight to its diversification goal in shaping the prospective rules, the Order makes clear that this change in policy was a reasonable administrative response to changed circumstances in the broadcasting industry. Order, at 1074–1075; see *FCC* v. *Pottsville Broadcasting Co.*, 309 U. S. 134, 137–138 (1940). The Order explained that, although newspaper owners had previously been allowed, and even encouraged, to acquire licenses for co-located broadcast stations because of the shortage of qualified license applicants, a sufficient number of qualified and experienced applicants other than newspaper owners was now available. In addition, the number of channels open for new licensing had diminished substantially. It had thus become both feasible and more urgent for the Commission to take steps to increase diversification of ownership, and a change in the Commission's policy toward new licensing offered the possibility of increasing diversity without causing any disruption of existing service. In light of these considerations, the Commission clearly did not take an irrational view of the public interest when it decided to impose a prospective ban on new licensing of co-located newspaper-broadcast combinations.[17]

---

[17] NAB and ANPA make one final argument in support of their position that the regulations exceed the Commission's authority. They claim that—

## B

Petitioners NAB and ANPA also argue that the regulations, though designed to further the First Amendment goal of

regardless of the otherwise broad scope of the Commission's rulemaking authority—both Congress and the Commission itself have indicated that the Commission lacks authority to promulgate any rules prohibiting newspaper owners from acquiring broadcast licenses. They rely on a legal opinion by the Commission's first General Counsel that was submitted to the Senate Interstate Commerce Committee, Memorandum to the Commission: Opinion of the General Counsel, Jan. 25, 1937, reprinted in App. 445–465, and the legislative history of proposed amendments to the Act that were considered in the late 1940's and early 1950's but never passed, S. 1333, § 25, Hearings on S. 1333 before a Subcommittee of the Senate Committee on Interstate and Foreign Commerce, 80th Cong., 1st Sess. (1947); S. 1973, § 14, 81st Cong., 1st Sess. (1949); S. 658, 82d Cong., 2d Sess. (1952) (House amendment § 7 (c)).

This argument is wholly unavailing. Apart from any questions as to the weight that should be given to a General Counsel's opinion which was never formally adopted by the Commission, and to legislative statements made subsequent to enactment of the statute being construed, see, *e. g., United States* v. *Southwestern Cable Co.*, 392 U. S. 157, 170 (1968); *United States* v. *Wise*, 370 U. S. 405, 411 (1962), the cited materials are simply irrelevant to the issue in this case. The Commission's General Counsel merely concluded that newspaper owners, as a class, could not be absolutely barred from owning broadcast stations; he did not address the much narrower question of whether a newspaper owner may be barred from acquiring a broadcast station located in the same community as the newspaper. See Opinion of the General Counsel, *supra,* App. 447, 449. Similarly, the proposed amendments to the Act apparently would have only precluded the Commission from adopting a total prohibition on newspaper ownership of broadcast stations. See Hearings on S. 1333, *supra,* at 44, 69–70; Hearings on S. 1973 before a Subcommittee of the Senate Committee on Interstate & Foreign Commerce, 81st Cong., 1st Sess., 20–21, 42–44, 103–105 (1949); S. Rep. No. 741, 81st Cong., 1st Sess., 2–3 (1949). Congress' rejection of the amendments as unnecessary, see House Conf. Rep. No. 2426, 82d Cong., 2d Sess., 18–19 (1952); S. Rep. No. 741, *supra,* at 2–3—following the Commission's representation that it lacked such authority even without the amendments, see Hearings on S. 1973, *supra,* at 103–104 (testimony of FCC Chairman Hyde)—sheds no light on the question at issue here.

achieving "the widest possible dissemination of information from diverse and antagonistic sources," *Associated Press* v. *United States,* 326 U. S., at 20, nevertheless violate the First Amendment rights of newspaper owners. We cannot agree, for this argument ignores the fundamental proposition that there is no "unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish." *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S., at 388.

The physical limitations of the broadcast spectrum are well known. Because of problems of interference between broadcast signals, a finite number of frequencies can be used productively; this number is far exceeded by the number of persons wishing to broadcast to the public. In light of this physical scarcity, Government allocation and regulation of broadcast frequencies are essential, as we have often recognized. *Id.,* at 375–377, 387–388; *National Broadcasting Co.* v. *United States,* 319 U. S., at 210–218; *Federal Radio Comm'n* v. *Nelson Bros. Bond & Mortgage Co.,* 289 U. S. 266, 282 (1933); see *supra,* at 795. No one here questions the need for such allocation and regulation, and, given that need, we see nothing in the First Amendment to prevent the Commission from allocating licenses so as to promote the "public interest" in diversification of the mass communications media.

NAB and ANPA contend, however, that it is inconsistent with the First Amendment to promote diversification by barring a newspaper owner from owning certain broadcasting stations. In support, they point to our statement in *Buckley* v. *Valeo,* 424 U. S. 1 (1976), to the effect that "government may [not] restrict the speech of some elements of our society in order to enhance the relative voice of others," *id.,* at 48–49. As *Buckley* also recognized, however, " 'the broadcast media pose unique and special problems not present in the traditional free speech case.' " *Id.,* at 50 n. 55, quoting *Columbia Broadcasting System* v. *Democratic National Committee,* 412 U. S.,

at 101. Thus efforts to " 'enhanc[e] the volume and quality of coverage' of public issues" through regulation of broadcasting may be permissible where similar efforts to regulate the print media would not be. 424 U. S., at 50–51, and n. 55, quoting *Red Lion Broadcasting Co.* v. *FCC, supra,* at 393; cf. *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974). Requiring those who wish to obtain a broadcast license to demonstrate that such would serve the "public interest" does not restrict the speech of those who are denied licenses; rather, it preserves the interests of the "people as a whole . . . in free speech." *Red Lion Broadcasting Co., supra,* at 390. As we stated in *Red Lion,* "to deny a station license because 'the public interest' requires it 'is not a denial of free speech.' " 395 U. S., at 389, quoting *National Broadcasting Co.* v. *United States, supra,* at 227. See also *Federal Radio Comm'n* v. *Nelson Bros. Bond & Mortgage Co., supra.*

Relying on cases such as *Speiser* v. *Randall,* 357 U. S. 513 (1958), and *Elrod* v. *Burns,* 427 U. S. 347 (1976), NAB and ANPA also argue that the regulations unconstitutionally condition receipt of a broadcast license upon forfeiture of the right to publish a newspaper. Under the regulations, however, a newspaper owner need not forfeit anything in order to acquire a license for a station located in another community.[18] More importantly, in the cases relied on by those petitioners, unlike the instant case, denial of a benefit had the effect of

---

[18] We note also that the regulations are in form quite similar to the prohibitions imposed by the antitrust laws. This court has held that application of the antitrust laws to newspapers is not only consistent with, but is actually supportive of the values underlying, the First Amendment. See, *e. g., Associated Press* v. *United States,* 326 U. S. 1 (1945); *Lorain Journal Co.* v. *United States,* 342 U. S. 143 (1951); *Citizen Publishing Co.* v. *United States,* 394 U. S. 131, 139–140 (1969). See also *United States* v. *Radio Corp. of America,* 358 U. S. 334, 351–352 (1959). Since the Commission relied primarily on First Amendment rather than antitrust considerations, however, the fact that the antitrust laws are fully applicable to newspapers is not a complete answer to the issues in this case.

abridging freedom of expression, since the denial was based solely on the content of constitutionally protected speech; in *Speiser* veterans were deprived of a special property-tax exemption if they declined to subscribe to a loyalty oath, while in *Elrod* certain public employees were discharged or threatened with discharge because of their political affiliation. As we wrote in *National Broadcasting, supra,* "the issue before us would be wholly different" if "the Commission ·[were] to choose among applicants upon the basis of their political, economic or social views." 319 U. S., at 226. Here the regulations are not content related; moreover, their purpose and effect is to promote free speech, not to restrict it.

Finally, NAB and ANPA argue that the Commission has unfairly "singled out" newspaper owners for more stringent treatment than other license applicants.[19] But the regulations treat newspaper owners in essentially the same fashion as other owners of the major media of mass communications were already treated under the Commission's multiple-ownership rules, see *supra,* at 780–781, and nn. 1–3; owners of radio stations, television stations, and newspapers alike are now restricted in their ability to acquire licenses for co-located broadcast stations. *Grosjean* v. *American Press Co.,* 297 U. S. 233 (1936), in which this Court struck down a state tax imposed only on newspapers, is thus distinguishable in the degree to which newspapers were singled out for special treatment. In addition, the effect of the tax in *Grosjean* was "to limit the circulation of information to which the public is entitled," *id.,* at 250, an effect inconsistent with the protection conferred on the press by the First Amendment.

In the instant case, far from seeking to limit the flow of information, the Commission has acted, in the Court of Appeals' words, "to enhance the diversity of information heard by the public without on-going government surveillance of the

---

[19] NAB frames this argument in terms of the First Amendment; ANPA advances it as an equal protection claim under the Fifth Amendment.

content of speech." 181 U. S. App. D. C., at 17, 555 F. 2d, at 954. The regulations are a reasonable means of promoting the public interest in diversified mass communications; thus they do not violate the First Amendment rights of those who will be denied broadcast licenses pursuant to them.[20] Being forced to "choose among applicants for the same facilities," the Commission has chosen on a "sensible basis," one designed to further, rather than contravene, "the system of freedom of expression." T. Emerson, The System of Freedom of Expression 663 (1970).

### III

After upholding the prospective aspect of the Commission's regulations, the Court of Appeals concluded that the Commission's decision to limit divestiture to 16 "egregious cases" of "effective monopoly" was arbitrary and capricious within the meaning of § 10 (e) of the APA, 5 U. S. C. § 706 (2) (A) (1976 ed.).[21] We agree with the Court of Appeals that regu-

---

[20] The reasonableness of the regulations as a means of achieving diversification is underscored by the fact that waivers are potentially available from both the prospective and the divestiture rules in cases in which a broadcast station and a co-located daily newspaper cannot survive without common ownership. See nn. 9, 11, *supra.*

[21] The APA provides in relevant part:

"To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

. . . . .

"(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

"(B) contrary to constitutional right, power, privilege, or immunity;

"(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

"(D) without observance of procedure required by law;

"(E) unsupported by substantial evidence in a case subject to sections

lations promulgated after informal rulemaking, while not subject to review under the "substantial evidence" test of the APA, 5 U. S. C. § 706 (2)(E) (1976 ed.) quoted in n. 21, *supra*, may be invalidated by a reviewing court under the "arbitrary or capricious" standard if they are not rational and based on consideration of the relevant factors. *Citizens to Preserve Overton Park* v. *Volpe*, 401 U. S. 402, 413–416 (1971). Although this review "is to be searching and careful," "[t]he court is not empowered to substitute its judgment for that of the agency." *Id.*, at 416.

In the view of the Court of Appeals, the Commission lacked a rational basis, first, for treating existing newspaper-broadcast combinations more leniently than combinations that might seek licenses in the future; and, second, even assuming a distinction between existing and new combinations had been justified, for requiring divestiture in the "egregious cases" while allowing all other existing combinations to continue in operation. We believe that the limited divestiture requirement reflects a rational weighing of competing policies, and we therefore reinstate the portion of the Commission's order that was invalidated by the Court of Appeals.

## A

### (1)

The Commission was well aware that separating existing newspaper-broadcast combinations would promote diversification of ownership. It concluded, however, that ordering wide-

556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

"(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

"In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." 5 U. S. C. § 706 (2) (1976 ed.).

spread divestiture would not result in "the best practicable service to the American public," Order, at 1074, a goal that the Commission has always taken into account and that has been specifically approved by this Court, *FCC* v. *Sanders Bros. Radio Station,* 309 U. S. 470, 475 (1940); see *supra,* at 782. In particular, the Commission expressed concern that divestiture would cause "disruption for the industry" and "hardship for individual owners," both of which would result in harm to the public interest. Order, at 1078. Especially in light of the fact that the number of co-located newspaper-broadcast combinations was already on the decline as a result of natural market forces, and would decline further as a result of the prospective rules, the Commission decided that across-the-board divestiture was not warranted. See *id.,* at 1080 n. 29.

The Order identified several specific respects in which the public interest would or might be harmed if a sweeping divestiture requirement were imposed: the stability and continuity of meritorious service provided by the newspaper owners as a group would be lost; owners who had provided meritorious service would unfairly be denied the opportunity to continue in operation; "economic dislocations" might prevent new owners from obtaining sufficient working capital to maintain the quality of local programming;[22] and local ownership of broadcast stations would probably decrease.[23] *Id.,* at 1078.

---

[22] Although the Order is less than entirely clear in this regard, the Commission's theory with respect to "economic dislocations" and programming apparently was that, because of high interest rates, new owners would have to devote a substantial portion of revenues to debt service, and insufficient working capital would remain to finance local programming. See Order, at 1068 (describing comments to this effect).

[23] In the Order the Commission expressed concern that a sweeping divestiture requirement "could reduce local ownership *as well as the involvement of owners in management.*" *Id.,* at 1078 (emphasis added). The Court of Appeals questioned the validity of any reliance on owner involvement in management, because "no evidence was presented that the local owners . . . are actively involved in daily management" and the Order itself had observed that " '[m]ost of the parties state that their

We cannot say that the Commission acted irrationally in concluding that these public-interest harms outweighed the potential gains that would follow from increasing diversification of ownership.

In the past, the Commission has consistently acted on the theory that preserving continuity of meritorious service furthers the public interest, both in its direct consequence of bringing proved broadcast service to the public, and in its indirect consequence of rewarding—and avoiding losses to—licensees who have invested the money and effort necessary to produce quality performance.[24] Thus, although a broadcast license must be renewed every three years, and the licensee must satisfy the Commission that renewal will serve the public interest, both the Commission and the courts have recognized that a licensee who has given meritorious service has a "legitimate renewal expectanc[y]" that is "implicit in the structure of the Act" and should not be destroyed absent good cause. *Greater Boston Television Corp.* v. *FCC*, 143 U. S. App. D. C. 383, 396, 444 F. 2d 841, 854 (1970), cert. denied, 403 U. S. 923 (1971); see *Citizens Communications Center* v. *FCC*, 145 U. S. App. D. C. 32, 44, and n. 35, 447 F. 2d 1201, 1213, and n. 35 (1971); *In re Formulation of Policies Relating to the Broadcast Renewal Applicant, Stemming From the Comparative Hearing Process*, 66 F. C. C. 2d 419, 420

broadcast stations and newspapers have separate management, facilities, and staff . . . .' " 181 U. S. App. D. C., at 27, 555 F. 2d, at 964, quoting Order, at 1059. Of course, the fact that newspapers and broadcast stations are separately managed does not foreclose the possibility that the common owner participates in management of the broadcast station and not the newspaper. But in any event, the Commission clearly did not place any significant weight on this factor, and we therefore need not consider it. See 5 U. S. C. § 706 (1976 ed.), quoted in part in n. 21, *supra* (rule of prejudicial error).

[24] We agree with the Court of Appeals that "[p]rivate losses are a relevant concern under the Communications Act only when shown to have an adverse effect on the provision of broadcasting service to the public." 181 U. S. App. D. C., at 27–28, 555 F. 2d, at 964–965, citing *FCC* v.

(1977); n. 5, *supra.*[25] Accordingly, while diversification of ownership is a relevant factor in the context of license renewal as well as initial licensing, the Commission has long considered the past performance of the incumbent as the most important factor in deciding whether to grant license renewal and thereby to allow the existing owner to continue in operation. Even where an incumbent is challenged by a competing applicant who offers greater potential in terms of diversification, the Commission's general practice has been to go with the "proved product" and grant renewal if the incumbent has rendered meritorious service. See generally *In re Formulation of Policies Relating to the Broadcast Renewal Applicant, Stemming from the Comparative Hearing Process, supra;* n. 5, *supra.*

In the instant proceeding, the Commission specifically noted that the existing newspaper-broadcast cross-owners as a group had a "long record of service" in the public interest; many were pioneers in the broadcasting industry and had established and continued "[t]raditions of service" from the outset. Order, at 1078.[26] Notwithstanding the Commission's diversification policy, all were granted initial licenses upon findings that the public interest would be served thereby, and those that had been in existence for more than three years had also had their

---

*Sanders Bros. Radio Station,* 309 U. S. 470, 474–476 (1940), and *Carroll Broadcasting* v. *FCC,* 103 U. S. App. D. C. 346, 258 F. 2d 440 (1958). Private losses that result in discouragement of investment in quality service have such an effect.

[25] Section 301 of the Act provides that "no [broadcast] license shall be construed to create any right, beyond the terms, conditions, and periods of the license." 47 U. S. C. § 301. The fact that a licensee does not have any legal or proprietary right to a renewal does not mean, however, that the Commission cannot take into account the incumbent's past performance in deciding whether renewal would serve the public interest. See *infra,* at 810–811, and n. 31.

[26] See B. Robbins, A Study of Pioneer AM Radio Stations and Pioneer Television Stations (1971), reprinted in App. 694–712.

licenses renewed on the ground that the public interest would be furthered. The Commission noted, moreover, that its own study of existing co-located newspaper-television combinations showed that in terms of percentage of time devoted to several categories of local programming, these stations had displayed "an undramatic but nonetheless statistically significant superiority" over other television stations. *Id.,* at 1078 n. 26.[27] An across-the-board divestiture requirement would result in loss of the services of these superior licensees, and—whether divestiture caused actual losses to existing owners, or just denial of reasonably anticipated gains—the result would be that future licensees would be discouraged from investing the resources necessary to produce quality service.

At the same time, there was no guarantee that the licensees who replaced the existing cross-owners would be able to provide the same level of service or demonstrate the same long-term commitment to broadcasting. And even if the new owners were able in the long run to provide similar or better service, the Commission found that divestiture would cause serious disruption in the transition period. Thus, the Commission observed that new owners "would lack the long knowledge of the community and would have to begin raw," and—because of high interest rates—might not be able to obtain sufficient working capital to maintain the quality of local programming. *Id.,* at 1078; see n. 22, *supra.*[28]

---

[27] Earlier in the Order, the Commission had noted that this study was the first to be based on the 1973 annual programming reports for television stations, which were not yet available at the time the programming studies submitted by the parties were conducted. Order, at 1073; see *id.,* at 1094.

The United States suggests that the Commission could not properly have relied on this study since it was not made available to the parties for comment in advance of the Commission's decision. Brief for United States 46 n. 39. No party petitioned the Commission for reconsideration on this ground, nor was the issue raised in the Court of Appeals or in any of the petitions for certiorari, and it is therefore not before us.

[28] Commissioner Hooks effectively summarized this complex of factors in

The Commission's fear that local ownership would decline was grounded in a rational prediction, based on its knowledge of the broadcasting industry and supported by comments in the record, see Order, at 1068–1069, that many of the existing newspaper-broadcast combinations owned by local interests would respond to the divestiture requirement by trading stations with out-of-town owners. It is undisputed that roughly 75% of the existing co-located newspaper-television combinations are locally owned, see 181 U. S. App. D. C., at 26–27, 555 F. 2d, at 963–964, and these owners' knowledge of their local communities and concern for local affairs, built over a period of years, would be lost if they were replaced with outside interests. Local ownership in and of itself has been recognized to be a factor of some—if relatively slight—significance even in the context of initial licensing decisions. See *Policy Statement on Comparative Broadcast Hearings*, 1 F. C. C. 2d, at 396. It was not unreasonable, therefore, for the Commission to consider it as one of several factors militating against divestiture of combinations that have been in existence for many years.[29]

his separate opinion, concurring in the Commission's decision not to order across-the-board divestiture, while dissenting on other grounds:

"[A]s I contemplate the superior performance of many newspaper-owned stations . . . and speculate on the performance of some unknown successor, my conditioned response yields 'a bird in the hand is worth two in the bush' philosophy. Opponents [of divestiture] ask: Why require divestiture for its own sake of a superior broadcaster, with experience, background and resources, for an unknown licensee whose operation may be inferior? Can we afford, through wide-scale divestiture, to experiment with a dogmatic diversity formula; and, after the churning has ceased, who will profit—the new owners or the public?" Order, at 1109.

[29] The fact that 75%, but not all, of the existing television-newspaper combinations are locally owned does not mean that it was irrational for the Commission to take into account local ownership as one of several factors justifying a decision to "grandfather" most existing combinations, including those that are not locally owned. The Commission has substantial discretion as to whether to proceed by rulemaking or adjudication, see *SEC* v.

In light of these countervailing considerations, we cannot agree with the Court of Appeals that it was arbitrary and capricious for the Commission to "grandfather" most existing combinations, and to leave opponents of these combinations to their remedies in individual renewal proceedings. In the latter connection we note that, while individual renewal proceedings are unlikely to accomplish any "overall restructuring" of the existing ownership patterns, the Order does make clear that existing combinations will be subject to challenge by competing applicants in renewal proceedings, to the same extent as they were prior to the instant rulemaking proceedings. Order, at 1087–1088 (emphasis omitted); see n. 12, *supra*. That is, diversification of ownership will be a relevant but somewhat secondary factor. And, even in the absence of a competing applicant, license renewal may be denied if, *inter alia*, a challenger can show that a common owner has engaged in specific economic or programming abuses. See nn. 12 and 13, *supra*.

### (2)

In concluding that the Commission acted unreasonably in not extending its divestiture requirement across the board, the Court of Appeals apparently placed heavy reliance on a "presumption" that existing newspaper-broadcast combinations "do not serve the public interest." See *supra*, at 790–791. The court derived this presumption primarily from the Commission's own diversification policy, as "reaffirmed" by adoption of the prospective rules in this proceeding, and secondarily from "[t]he policies of the First Amendment," 181 U. S. App. D. C., at 26, 555 F. 2d, at 963, and the Commission's statutory duty to "encourage the larger and more effective use of radio in the public interest," 47 U. S. C. § 303 (g). As explained

---

*Chenery Corp.*, 332 U. S. 194, 201–202 (1947), and—in the context of a rule based on a multifactor weighing process—every consideration need not be equally applicable to each individual case.

in Part II above, we agree that diversification of ownership furthers statutory and constitutional policies, and, as the Commission recognized, separating existing newspaper-broadcast combinations would promote diversification. But the weighing of policies under the "public interest" standard is a task that Congress has delegated to the Commission in the first instance, and we are unable to find anything in the Communications Act, the First Amendment, or the Commission's past or present practices that would require the Commission to "presume" that its diversification policy should be given controlling weight in all circumstances.[30]

Such a "presumption" would seem to be inconsistent with the Commission's longstanding and judicially approved practice of giving controlling weight in some circumstances to its more general goal of achieving "the best practicable service to the public." Certainly, as discussed in Part III–A (1) above, the Commission through its license renewal policy has made clear that it considers diversification of ownership to be a factor of less significance when deciding whether to allow an existing licensee to continue in operation than when evaluating applicants seeking initial licensing. Nothing in the language or the legislative history of § 303 (g) indicates that Congress intended to foreclose all differences in treatment between new and existing licensees, and indeed, in amending § 307 (d) of the Act in 1952, Congress appears to have lent its approval to the Commission's policy of evaluating existing licensees on a

---

[30] The Order at one point states: "If our democratic society is to function, *nothing can be more important* than insuring that there is a free flow of information from as many divergent sources as possible." Order, at 1079 (emphasis added). The Court of Appeals recognized, however, that "the Commission probably did not intend for this . . . statemen[t] to be read literally," 181 U. S. App. D. C., at 26, 555 F. 2d, at 963, and, indeed, it appears from the context that the statement was intended only as an explanation of why the Commission was adopting a First Amendment rather than an antitrust focus.

somewhat different basis from new applicants.[31] Moreover, if
enactment of the prospective rules in this proceeding itself
were deemed to create a "presumption" in favor of divestiture,
the Commission's ability to experiment with new policies
would be severely hampered. One of the most significant ad-
vantages of the administrative process is its ability to adapt to
new circumstances in a flexible manner, see *FCC* v. *Pottsville
Broadcasting Co.*, 309 U. S., at 137–138, and we are unwilling
to presume that the Commission acts unreasonably when it
decides to try out a change in licensing policy primarily on a
prospective basis.

The Court of Appeals also relied on its perception that the
policies militating against divestiture were "lesser policies" to
which the Commission had not given as much weight in the past
as its diversification policy. See *supra*, at 791. This percep-
tion is subject to much the same criticism as the "presumption"
that existing co-located newspaper-broadcasting combinations
do not serve the public interest. The Commission's past con-
cern with avoiding disruption of existing service is amply
illustrated by its license renewal policies. In addition, it is
worth noting that in the past when the Commission has

---

[31] Prior to 1952, § 307 (d) provided that decisions on renewal applications
"shall be limited to and governed by the same considerations and practice
which affect the granting of original applications." See Communications
Act of 1934, § 307 (d), 48 Stat. 1084. In 1952 the section was amended to
provide simply that renewal "may be granted . . . if the Commission finds
that public interest, convenience, and necessity would be served thereby."
Communications Act Amendments, 1952, § 5, 66 Stat. 714. The House
Report explained that the previous language "is neither realistic nor does
it reflect the way in which the Commission actually has handled renewal
cases," H. R. Rep. No. 1750, 82d Cong., 2d Sess., 8 (1952), and the
Senate Report specifically stated that the Commission has the "right and
duty to consider, in the case of a station which has been in operation and is
applying for renewal, the overall performance of that station against the
broad standard of public interest, convenience, and necessity," S. Rep.
No. 44, 82d Cong., 1st Sess., 7 (1951).

changed its multiple-ownership rules it has almost invariably tailored the changes so as to operate wholly or primarily on a prospective basis. For example, the regulations adopted in 1970 prohibiting common ownership of a VHF television station and a radio station serving the same market were made to apply only to new licensing decisions; no divestiture of existing combinations was required. See n. 3, *supra*. The limits set in 1953 on the total numbers of stations a person could own, upheld by this Court in *United States* v. *Storer Broadcasting Co.*, 351 U. S. 192 (1956), were intentionally set at levels that would not require extensive divestiture of existing combinations. See *Multiple Ownership of AM, FM and Television Broadcast Stations*, 18 F. C. C., at 292. And, while the rules adopted in the early 1940's prohibiting ownership or control of more than one station in the same broadcast service in the same community required divestiture of approximately 20 AM radio combinations, FCC Eleventh Annual Report 12 (1946), the Commission afforded an opportunity for case-by-case review, see Multiple Ownership of Standard Broadcast Stations, 8 Fed. Reg. 16065 (1943). Moreover, television and FM radio had not yet developed, so that application of the rules to these media was wholly prospective. See Rules and Regulations Governing Commercial Television Broadcast Stations, *supra*, n. 1; Rules Governing Standard and High Frequency Broadcast Stations, *supra*, n. 1.

The Court of Appeals apparently reasoned that the Commission's concerns with respect to disruption of existing service, economic dislocations, and decreases in local ownership necessarily could not be very weighty since the Commission has a practice of routinely approving voluntary transfers and assignments of licenses. See 181 U. S. App. D. C., at 26–28, 555 F. 2d, at 963–965. But the question of whether the Commission should compel proved licensees to divest their stations is a different question from whether the public interest is served

by allowing transfers by licensees who no longer wish to continue in the business. As the Commission's brief explains:

"[I]f the Commission were to force broadcasters to stay in business against their will, the service provided under such circumstances, albeit continuous, might well not be worth preserving. Thus, the fact that the Commission approves assignments and transfers in no way undermines its decision to place a premium on the continuation of proven past service by those licensees who wish to remain in business." Brief for Petitioner in No. 76–1471, p. 38 (footnote omitted).[32]

The Court of Appeals' final basis for concluding that the Commission acted arbitrarily in not giving controlling weight to its divestiture policy was the Court's finding that the rulemaking record did not adequately "disclose the extent to which divestiture would actually threaten" the competing policies relied upon by the Commission. 181 U. S. App. D. C., at 28, 555 F. 2d, at 965. However, to the extent that factual determinations were involved in the Commission's decision to "grandfather" most existing combinations, they were primarily of a judgmental or predictive nature—*e. g.,* whether a divestiture requirement would result in trading of stations with out-of-town owners; whether new owners would perform as well as existing crossowners, either in the short run or in the long run; whether losses to existing owners would result from forced sales; whether such losses would discourage future investment in quality programming; and whether new owners would have sufficient working capital to finance local program-

---

[32] The Commission also points out, Brief for Petitioner in No. 76–1471, p. 24, that it has a rule against "trafficking"—*i. e.,* the acquisition and sale of licenses to realize a quick profit—that applies to license transfers or assignments within three years after a licensee commences operations. See 47 CFR § 1.597 (1976); *Crowder* v. *FCC,* 130 U. S. App. D. C. 198, 201–202, and nn. 22–23, 399 F. 2d 569, 572–573, and nn. 22–23, cert. denied, 393 U. S. 962 (1968).

ming. In such circumstances complete factual support in the record for the Commission's judgment or prediction is not possible or required; "a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency," *FPC* v. *Transcontinental Gas Pipe Line Corp.*, 365 U. S. 1, 29 (1961); see *Industrial Union Dept., AFL–CIO* v. *Hodgson,* 162 U. S. App. D. C. 331, 338–339, 499 F. 2d 467, 474–475 (1974).

## B

We also must conclude that the Court of Appeals erred in holding that it was arbitrary to order divestiture in the 16 "egregious cases" while allowing other existing combinations to continue in operation. The Commission's decision was based not—as the Court of Appeals may have believed, see *supra,* at 792—on a conclusion that divestiture would be more harmful in the "grandfathered" markets than in the 16 affected markets, but rather on a judgment that the need for diversification was especially great in cases of local monopoly. This policy judgment was certainly not irrational, see *United States* v. *Radio Corp. of America,* 358 U. S., at 351–352, and indeed was founded on the very same assumption that underpinned the diversification policy itself and the prospective rules upheld by the Court of Appeals and now by this Court—that the greater the number of owners in a market, the greater the possibility of achieving diversity of program and service viewpoints.

As to the Commission's criteria for determining which existing newspaper-broadcast combinations have an "effective monopoly" in the "local marketplace of ideas as well as economically," we think the standards settled upon by the Commission reflect a rational legislative-type judgment. Some line had to be drawn, and it was hardly unreasonable for the Commission to confine divestiture to communities in which there is common ownership of the only daily newspaper and

either the only television station or the only broadcast station of any kind encompassing the entire community with a clear signal. Cf. *United States* v. *Radio Corp. of America, supra,* at 351–352, quoted, *supra,* at 796. It was not irrational, moreover, for the Commission to disregard media sources other than newspapers and broadcast stations in setting its divestiture standards. The studies cited by the Commission in its notice of rulemaking unanimously concluded that newspapers and television are the two most widely utilized media sources for local news and discussion of public affairs; and, as the Commission noted in its Order, at 1081, "aside from the fact that [magazines and other periodicals] often had only a tiny fraction in the market, they were not given real weight since they often dealt exclusively with regional or national issues and ignored local issues." Moreover, the differences in treatment between radio and television stations, see n. 10, *supra,* were certainly justified in light of the far greater influence of television than radio as a source for local news. See Order, at 1083.

The judgment of the Court of Appeals is affirmed in part and reversed in part.

*It is so ordered.*

MR. JUSTICE BRENNAN took no part in the consideration or decision of these cases.