**HOME BOX OFFICE, INC., et al., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**Metromedia, Inc., American Broadcasting Co., Inc., Forward Communications Corp., et al., National Association of Broadcasters, Paramount Pictures Corporation, CBS, Inc., National Broadcasting Company, Inc., Intervenors.**

**No. 77–1878.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 15, 1978.

Decided Sept. 20, 1978.

As Amended Sept. 26, 1978.

**63.** *Id.*

Stuart Robinowitz, New York City, with whom Simon H. Rifkind, Moses Silverman, Richard Kurnit, Daniel H. Bookin, New York City, Harry M. Plotkin, George H. Shapiro and Alan P. Auckenthaler, Washington, D. C., were on the brief, for petitioners.

Jack D. Smith, Counsel, F.C.C., Washington, D. C., for respondent. Daniel M. Armstrong, Associate Gen. Counsel, C. Grey Pash, Jr., Roberta L. Cook and Keith H. Fagan, Counsel, F.C.C. Washington, D. C., were on the brief, for respondents.

E. William Henry, Washington, D. C., with whom Lawrence P. Keller, Washington, D. C., was on the brief, for intervenor, Paramount Pictures Corp.

Thomas J. Dougherty and Preston R. Padden, Washington, D. C., were on the brief, for intervenor, Metromedia, Inc.

James A. McKenna, Jr. and Thomas N. Frohock, Washington, D. C., were on the brief, for intervenors, American Broadcasting Co., Inc. and Forward Communications Corp., et al.

Erwin G. Krasnow and James J. Popham, Washington, D. C., were on the brief, for intervenors, National Association of Broadcasters.

Joel Rosenbloom, Stephen A. Weiswasser and Daniel L. Brenner, Washington, D. C., were on the brief, for intervenors, CBS, Inc.

Corydon B. Dunham, New York City, Bernard G. Segal, Jerome J. Shestack, Philadelphia, Pa., and Howard Monderer, Washington, D. C., were on the brief, for intervenors, National Broadcasting Co., Inc.

Also John J. Powers, III and Susan J. Atkinson, Attys., Dept. of Justice, Washington, D. C., for respondent, United States.

Also J. Roger Wollenberg and Nancy C. Garrison, Washington, D. C., for intervenors, CBS, Inc.

Before BAZELON, Circuit Judge, and TUTTLE,* Senior Circuit Judge, for the United States Court of Appeals for the Fifth Circuit, and ROBB, Circuit Judge.

Opinion for the Court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

This case is a sequel to *Home Box Office, Inc. v. FCC,* 185 U.S.App.D.C. 142, 567 F.2d 9, *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). In that case the petitioner Home Box Office challenged orders of the Federal Communications Commission which regulated and limited the program fare cablecasters and subscription broadcast television stations might offer to the public for a fee. The Commission's orders, issued in 1975, established rules which, among other things, prohibited pay exhibition of feature moving picture films more than three but less than ten years old. The Commission's stated purpose was to prevent the drawing off or "siphoning" of popular program material from the free television service to a service for which the audience would have to pay a fee. This "siphoning" was said to be possible because the amount of money received from paying viewers was significantly greater for some programs than the amount received from advertisers to attach their messages to the same material. In its decision this court held that with respect to pay cable television the so-called anti-siphoning rules were invalid. Although the court did not disturb the rules as applied to subscription broadcast television the Commission itself repealed those rules on November 22, 1977. As a result all restrictions imposed by the Commission on pay television's use of feature films were eliminated.[1]

In addition to its attack on the "anti-siphoning" rules the petitioner Home Box Office requested this court to order the Commission to complete its "program exclusivity" proceedings. "Program exclusivity" means a practice whereby broadcasters by contract obtain exclusive exhibition rights against pay television. It appeared that since 1971 the problem of exclusivity had been under consideration by the Commission and that in 1975, by a "Notice of Inquiry" establishing Docket 20402, the Commission had begun a proceeding in which the issue was to be resolved. Noting that for eighteen months the Commission had taken no action in Docket 20402 we

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. Pay cable refers to cable telecasting of programs for which the cable television subscriber is charged an additional fee, or an additional channel fee beyond the regular monthly cable subscription fee. Subscription television (STV) involves the broadcast of a scrambled television signal which can be received in intelligible form only for a fee. We use the term "pay television" to refer to both pay cable and subscription operations.

entered an order directing the Commission to terminate its proceedings concerning program exclusivity within 180 days. We observed that the use of exclusivity clauses raised antitrust questions. *Home Box Office, Inc. v. FCC,* 185 U.S.App.D.C. 142, 150 n. 4, 567 F.2d 9, 17 n. 4. Our opinion and order issued March 25, 1977.

On September 21, 1977 the Commission adopted its Report and Order in Docket 20402, —— F.C.C.2d ——, 41 Pike & Fischer R.R.2d 839. By this Report and Order the Commission terminated its inquiry into TV program exclusivity contracts. In summary, the Commission held:

> that market forces should be given an opportunity to find an appropriate place for feature films in the sequential media use of feature films, the antitrust laws as currently interpreted and enforced should be sufficient to deter the unlawful exercise of market power, collusive behavior, and any other anticompetitive practices in the distribution of feature films to television, and that it is appropriate . . to defer the adoption of rules until such time as there is some credible evidence that the structure of the marketplace, reinforced with appropriate antitrust enforcement procedures, is insufficient to protect the public.

*Id.* at ——, 41 Pike & Fischer R.R.2d at 848.

The petitioner Home Box Office now seeks review of the Commission's Report and Order (hereinafter referred to as Report). The petitioner says the Commission's action is arbitrary and capricious, disregards the mandate of the first Home Box Office case, and violates the Commission's duty to promote diversity of programs and sources and its duty to promote the goals of the antitrust laws and to encourage development of new media. Specifically, the petitioner asks us to direct the Commission to prohibit broadcaster exclusivity practices against pay television as contrary to the public interest. As an alternative, the petitioner requests us to remand the case to the Commission with a direction to answer specific questions as to why broadcaster exclusivity serves the public interest. However

we think the Commission reasonably concluded, in the exercise of its discretion, that as a matter of policy further restrictions should not be placed upon the industry at this time and that it is best to defer action until the play of competitive forces can be observed.

The Notice of Inquiry in Docket 20402 announced the intention of the Commission to explore the "effects of exclusive contracts entered into either by conventional or subscription television interests which give one form of television service exclusive use of program material vis-à-vis the other, and to elicit comments of interested persons on the subject." 52 F.C.C.2d 87, 40 Fed.Reg. 15576 (1975). Comments were received from television broadcast licensees, the three commercial television networks, cable television system owners and programmers, feature film producers, and one public interest group. In addition, the Commission had before it evidence developed during the Senate Antitrust and Monopoly Subcommittee hearings in May and June of 1975, together with information gleaned from other related public proceedings of the Commission. Thus the Commission's findings and conclusions were based upon a thorough exploration of the facts in the light of the contentions of the interested parties.

In its Report the Commission first considered typical contracts between distributors and broadcasters whereby broadcasters acquire exclusive rights to the use of feature films. These contracts are geared to "availability dates" and "broadcast dates". The availability date is the first date on which a broadcaster by contract has the right to telecast a film. The broadcast date is the day on which the telecast takes place, and may be months or years after the availability date. Also in the lexicon of the business is the term "up front period", meaning the three-year period under the anti-siphoning rules when new films were available for pay use. The Commission found that contracts give the networks exclusive rights to the use of films beginning from two to six months prior to the availability date of a film and extending through

the broadcast date. Because of the interval between the availability date and the broadcast date the total span of exclusivity before use may be as much as a year or even two years. Moreover, in the past these contracts frequently took effect during the three-year "up front period". Individual station licensees, both independents and network affiliates, also contract for exclusivity against other television stations in direct competition with them and against pay cable operations within their service area. Such exclusive rights may extend for as much as seven years.

The Commission found general agreement as to the effect on pay television of the exclusivity practices which we have summarized. As new feature films are produced and complete their initial theatrical runs, virtually all are made available for pay use; however the duration of this availability is controlled by the exclusivity clauses in the contracts for sales of the films to networks. Use by pay television is terminated when the network exclusivity takes effect. Generally, feature films go from the networks into the syndication market where they are sold on an exclusive basis to local stations. Because the local contracts have different expiration dates a nationwide pay operation such as Home Box Office has great difficulty in securing films which are available for nationwide telecast.

Broadly stated, the question before the Commission was whether in view of the facts disclosed by the record the public interest required the promulgation of a rule prohibiting or regulating broadcaster exclusivity practices. In the judgment of the Commission the answer to the question was no.

■ Our evaluation of the Commission's conclusion must be governed by clearly defined principles. Although we may invalidate the Commission's action as arbitrary or capricious if it is not rational and based on a consideration of the relevant factors, we are not empowered to substitute our judgment for that of the agency. If the order under review reflects a rational weighing of competing policies, it must be

sustained. *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978); *Citizens Committee to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Moreover we may not demand complete factual support in the record for the Commission's judgment insofar as it rested upon factual determinations that "were primarily of a judgmental or predictive nature"; for "a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency." *FCC v. National Citizens Committee for Broadcasting, supra* 436 U.S. at 814, 98 S.Ct. at 2122 (*quoting Federal Power Commission v. Transcontinental Gas Pipe Line Corp.,* 365 U.S. 1, 29, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961)).

The foregoing principles were applied by this court in *Action for Children's Television v. FCC,* 183 U.S.App.D.C. 437, 564 F.2d 458 (1977). In that case we upheld, as a reasoned exercise of the Commission's discretion, the agency's decision not to adopt regulations governing advertising and programming practices for children's television. We said:

> In sum, we must sustain the Commission's decision that the public interest does not require the promulgation of specific rules for the time being, if it violates no law, is blessed with an articulated justification that makes a "rational connection between the facts found and the choice made," and follows upon a "hard look" by the agency at the relevant issues.

> \* \* \* \* \* \*

> While we believe that the Commission may well have adequate authority to regulate in this area, and even perhaps to the extent proposed by ACT, we see no compelling reason why the Commission should not be allowed to give the industry's self-regulatory efforts a reasonable period of time to demonstrate that they will be successful in rectifying the inadequacies of children's television identified in the Report.

*Id.* at 458, 459, 564 F.2d at 479, 480. [footnotes omitted]

■ We preface our analysis of the Commission's Report with the observation that there is nothing novel or startling about a contract granting the exclusive right to publish or broadcast. The Constitution authorizes legislation securing to authors for a limited time "the exclusive Right to their respective Writings." U.S.Const., Art. I, § 8, cl. 8. Contracts conferring the exclusive right to broadcast sporting events and artistic or theatrical performances are commonplace. In the field of cable television the Commission's rules recognize and protect against duplication exclusive broadcast exhibition rights of local stations. 47 C.F.R. § 76.151 *et seq.* (1976). Although the antitrust laws prohibit the use of exclusivity contracts as a means of unreasonably restraining competition, they permit the creation and transfer of exclusive rights that reasonably serve to maintain or enhance the value of an artistic or intellectual product. *See United States v. Paramount Pictures, Inc.,* 66 F.Supp. 323 (S.D.N.Y. 1946), *modified,* 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948).

■ Turning to the specific contentions of the petitioner we quickly reject the argument that the Commission in its Report has disregarded the mandate of the first *Home Box Office* case. According to the petitioner this court directed the Commission to give careful consideration to the antidiversity and anticompetitive ramifications of exclusivity but the Commission "now ducks these issues" and has only "rubber-stamped a staff-prepared opinion which [it] had never considered before." (Petitioner's Brief 26). We think the petitioner misapprehends the scope of our order in the *Home Box Office* case. That order merely directed the Commission "to terminate its proceedings in Docket 20402 (concerning program exclusivity) within 180 days." 185 U.S.App.D.C. at 193, 567 F.2d at 60–61.

Although we called the agency's attention to the relevant antitrust and program diversity questions, we gave no directions as to what action, if any, the Commission should take. The Commission's Report considered the public interest and antitrust questions presented, concluded that no rule prohibiting exclusivity was necessary at that time, and terminated the proceeding. Thus, the Commission fully complied with our mandate. We find no basis in the record for the charge that the Commission failed to give full consideration to its Report.[2]

Addressing the Commission's alleged failure to promote diversity of programs and sources the petitioner says that only a few of the approximately 100 feature films released each year by major American studios are available for pay telecasting. The petitioner points to evidence that most of the 7,000 desirable older films are covered by broadcasters' exclusivity contracts. Thus, says the petitioner, pay cable "lacks a sufficient supply of films." To emphasize the disadvantages under which pay television is said to labor the petitioner notes the disparity between pay television and commercial television in terms of audience and revenues—1,200,000 pay cable homes and almost 80,000,000 commercial television homes; commercial broadcaster revenues of $6,000,000,000 in 1976 compared to $115,000,000 for pay cable. The remedy, says the petitioner, is the prohibition of broadcasters' exclusivity, which would enable pay television to offer the public diversity in programs, formats and scheduling.

An important if not decisive factor in weighing the Commission's Report is that the inquiry in Docket 20402, which the Report terminated, was predicated on the assumption that the anti-siphoning rules restricting pay television would remain in effect. Thus the notice of inquiry stated that a basic issue in the proceedings was wheth-

---

**2.** The petitioner attacks the Commission's order on various procedural grounds. We find no merit in these arguments. The Commission's procedures satisfied all statutory requirements and there is no showing of any prejudicial irregularity. *See Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Nader v. FCC,* 172 U.S.App.D.C. 1, 14 n. 9, 520 F.2d 182, 195 n. 9 (1975).

er the degree of exclusivity generally contracted for "when viewed in conjunction with the Commission's anti-siphoning regulations, will markedly inhibit the development of subscription television services." 52 F.C.C.2d at 89 (1975). When the anti-siphoning rules were vacated the position of pay television in the marketplace was substantially changed; specifically, pay television then became able to bid for any film without restriction by government regulation.

The Commission found it undisputed that "almost without exception, every new feature film is available for subscription television use between its theatrical and network exhibitions and that the growth of the industry has been dramatic." 41 Pike & Fischer R.R.2d at 849. This growth was achieved notwithstanding the exclusivity system and the restrictions formerly imposed on pay television by the anti-siphoning rules. Considering the situation now existing the Commission wrote:

Now those rules are gone so far as feature films are concerned. Along with the majority of the film suppliers commenting in Docket 20402, we feel a need to look at 1977 and later developments in the absence of regulatory restraints. We would like to see whether the removal of the three-to-ten-year moratorium will allow the claimed "theater-pay cable-network-syndication" sequencing foreseen by the suppliers to come into being. We would like to know whether pay cable networks, if offered films between theatrical and network or other broadcast exhibition, will be able to protect themselves contractually against premature "yanking" of those films arising from network pre-clearance desires.

41 Pike & Fischer R.R.2d at 850, 851.

The Commission conceded that the problems of pay television have not been alleviated with respect to older films already in syndication and under contract to stations in individual markets. As we have indicated, this problem exists because older films under exclusive contract to local stations are not available for broadcast by a nationwide pay network. The Commission reasoned, however:

that if the suppliers are right in their expectation of an immediate post-theatrical pay exhibition phase, the likely continued growth of the pay media, both cable and broadcast, will give them an increasing ability to bid for product in the later local marketing phase. We see no reason why a supplier or distributor of films in syndication would not take increasing account of prospective pay purchasers if the dollars were available. And that recognition of the new power in the market might affect not only price but also the means by which films are packaged and the degree of exclusivity granted for their exhibition. Present syndication practices, not surprisingly, are tailored to the needs of individual broadcast stations. But if broadcast and cable subscription television continue to grow, their needs increasingly should become important to suppliers and distributors.

41 Pike & Fischer R.R.2d at 851.

As for the delay in the exhibition of feature films caused by exclusivity contracts the Commission cited our observation in *Home Box Office v. FCC, supra,* 185 U.S.App.D.C. at 183, 567 F.2d at 50, that "we doubt that the Commission's interest in preventing delay of motion picture broadcasts could be shown to be important or substantial on any record." The Commission concluded that although the timing of pay exhibition is a matter of consequence, "it provides far less reason for regulatory intervention than would the total unavailability of film product to the pay media." 41 Pike & Fischer R.R.2d at 849.

Turning to the antitrust questions raised in the proceedings the Commission observed that the issue is whether exclusivity contracts are unreasonable because unduly extended in area or duration or in excess of what is reasonably necessary to protect the licensee. *See United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 145, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). After reviewing

the arguments on the issue of reasonableness the Commission concluded that:

> criteria for establishing the reasonableness of exclusivity provisions of television network and broadcast programming contracts vis-a-vis subscription broadcast and cable pay television are not established.

41 Pike & Fischer R.R.2d at 853

This is so, said the Commission:

> because the role of subscription television in its use of feature films remains to be established. In particular, it seems that much of the debate over how the law should be applied is a debate over whether pay television will end up simply as the equivalent of a slightly different type of broadcast entity or whether it will operate as a theatre that has, incidentally, been electronically extended into the homes of subscribers. Actual answers to these questions are only now beginning to be developed by a process of trial and error on the part of those actually involved in marketing subscription television services.

*Id.*

Because of the uncertainty surrounding the future role of pay television the Commission believed that any attempt to reach a judgment as to the reasonableness of exclusive contractual practices would amount to speculation rather than factfinding. Accordingly the Commission determined to leave the resolution of the matter to the courts and to the marketplace. The Commission added:

> In taking this action, however, two additional points should be made quite firmly. First, we are strongly influenced in our analysis, and in our feeling that it is not necessary to pursue the antitrust issues to their ultimate conclusion, by a belief that subscription television is developing and will continue to develop without our intervention. Evidence to the contrary would be grounds for our reopening this proceeding. Second, it is our belief that over the long run some accommodation in the marketplace will be made so that the public is provided a choice between pay and advertiser-supported television.

41 Pike & Fischer R.R.2d at 854

■ In essence the issue raised by the petition for review is whether the Commission's decision reflected "a rational legislative-type judgment". *See FCC. v. National Citizens Committee for Broadcasting, supra,* 436 U.S. at 814, 98 S.Ct. 2096. We conclude that it did. The Commission gave careful consideration to the policy concerns advanced by the petitioner but nevertheless concluded that there was no credible evidence justifying intervention by regulation. The Commission did find that pay television's access to films had been restricted in the past, but this the Commission found to be attributable in large part to the anti-siphoning rules. Those rules have now been eliminated. Instead of imposing any restrictions, the Commission concluded, it was appropriate to allow the market to assimilate pay exhibition and the sequential distribution of films. The Commission emphasized that pay television was expected to continue its growth, which has been dramatic notwithstanding the former restrictions on pay exhibition. Moreover, the Commission was confident that in the absence of regulation the public will have a choice between pay and conventional television. The Commission believed that pay television, which now has access to every new film, will be able by contract to protect its showing of new films against the networks, and will be able to bid competitively against local stations for older films. Finally, the Commission observed that the competitive role of pay television is still evolving; and the agency believed that the market structure and antitrust laws would deter any predatory practices. Accordingly, although the Commission promised to continue its review of the matter, it declined to impose the rigidity and detailed oversight that agency intervention would entail, or to regulate against a problem which did not exist.

The Commission's decision not to regulate was the result of a rational weighing of the relevant policy considerations, and was

"grounded in a rational prediction, based on [the agency's] knowledge of the broadcasting industry and supported by comments in the record." *FCC v. National Citizens Committee for Broadcasting, supra* 808 U.S. at 436, 98 S.Ct. at 2119. An agency's decision not to adopt rules is entitled to great deference, and, as in *Action for Children's Television v. FCC, supra,* we see no reason why the Commission should not permit private action and the play of competitive forces to correct any lack of balance in the market that may exist. We repeat the comment in our opinion in the first *Home Box Office* case, in which we spoke critically of the Commission's choice to regulate rather than allow a period of unregulated experimentation in which data for informed decision-making would be generated. 185 U.S.App.D.C. at 170, n. 60, 567 F.2d at 37 n. 60. We refer also to the Supreme Court's observation that "'[u]nderlying the whole [Communications Act] is recognition of the rapidly fluctuating factors characteristic of the evolution of broadcasting and the corresponding requirement that the administrative process possess sufficient flexibility to adjust itself to these factors.'" *United States v. Southwestern Cable Co.,* 392 U.S. 157, 172–73, 88 S.Ct. 1994, 2003, 20 L.Ed.2d 1001 (1968) (*quoting FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 138, 60 S.Ct. 437, 84 L.Ed. 656 (1940)). Of course, our decision here leaves undisturbed the Commission's continuing responsibility to review competitive conditions in this volatile industry, and to act promptly in response to future developments. *See Delta Airlines v. CAB,* 147 U.S.App.D.C. 272, 276–77, 455 F.2d 1340, 1344–45 (1971).

In sum, we think the Commission's conclusion is reasonable and we decline to substitute our judgment for that of the agency. Accordingly the Commission's order is

*Affirmed.*