473 F.Supp. 52 (1979)
Denton ROBERTS, and all owners and lessees of property in Aberdeen and Monroe County, Mississippi, similarly situated
v.
SECRETARY, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Federal Insurance Administration, the Mayor and Board of Aldermen of the City of Aberdeen, Mississippi, and the Chairman and Commissioners, Mississippi State Highway Commission, State of Mississippi.
No. EC 78-48-K.
United States District Court, N. D. Mississippi, E. D.
May 23, 1979.
*53 William M. Pace, Aberdeen, Miss., for plaintiff.
David W. Houston III, Aberdeen, Miss., A. F. Summer, Jackson, Miss., H. M. Ray, Oxford, Miss., for defendants.

MEMORANDUM OPINION
KEADY, Chief Judge.
In this action, Denton Roberts, property owner in the City of Aberdeen, Monroe County, Mississippi, instituted suit against the Secretary of the Department of Housing and Urban Development (HUD); Federal Insurance Administrator of the Federal Insurance Administration (Administrator); the Mayor and Board of Aldermen of the City of Aberdeen, and the Chairman and Commissioners of the Mississippi State Highway Commission, seeking judicial review under the Administrative Procedure Act, 5 U.S.C. § 704 et seq., of HUD's administrative decision with respect to the application of the National Flood Insurance Program to the City of Aberdeen.[1] The only issue remaining in the case, in accordance with this court's prior orders, is whether the National Flood Insurance Program made applicable to the City of Aberdeen is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law so as to make HUD's decision come within the scope of judicial review provided by 5 U.S.C. § 706.[2] By order dated February 5, *54 1979, we refused to grant the federal defendants summary judgment and ordered that the cause proceed solely with respect to the accuracy of the flood plain designations developed for the City of Aberdeen and whether defendants' actions relevant to the development thereof were arbitrary and capricious. The federal defendants have again moved for summary judgment in their favor, asserting that the court should limit its consideration to the administrative record made by the federal defendants, and by so doing, there are no facts that are subject to trial de novo by us as a reviewing court. It is urged that to determine whether the federal defendants' actions were arbitrary should be based entirely upon the administrative record, and where the facts have been adequately considered in the administrative proceeding, de novo review of the agency decision by a court as "unwarranted by the facts," in accordance with 5 U.S.C. § 706(2)(F), is appropriate, under teachings of the Supreme Court, only under limited circumstances. Federal defendants cite Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). In Camp v. Pitts, the Supreme Court expressly held:
It is quite plain from our decision in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 [, 91 S.Ct. 814, 21 L.Ed.2d 136] (1971), that de novo review is appropriate only where there are inadequate factfinding procedures in an adjudicatory proceeding, or where judicial proceedings are brought to enforce certain administrative actions.
More specifically, federal defendants contend that the administrative record shows that all of the procedural steps contemplated by statute were complied with, that certain original objections raised by the City of Aberdeen were taken into account before the Mayor and Board of Aldermen on February 28, 1978, unanimously adopted the Flood Plain Management Ordinance and Flood Boundary Floodway Map, prerequisites for the City of Aberdeen to qualify for the sale of flood insurance to Aberdeen property owners. The plaintiff stands on his position that the flood plain designations developed for the City of Aberdeen and the defendants' actions relevant to the development thereof were arbitrary and capricious. No supporting affidavits in opposition to the federal defendants' motion for summary judgment have been filed.
Therefore, the problem before the court is to determine whether the administrative record contains adequate facts with respect to judicial review so as to make inappropriate the receipt of evidence upon a de novo review of the agency decision. Upon a review of the applicable law, regulations and administrative record, we hold that the fact finding procedures in the administrative proceedings were adequate and make unnecessary the receipt of additional evidence on a de novo hearing before this court.
The second question is a more complicated and difficult one, that is, whether the determination of the federal defendants in the development of the flood plain designations for the City of Aberdeen, the federal defendants' actions relevant thereto concerning the Draft Flood Insurance Study and Flood Insurance Rate Map and resulting decisions were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law or without observance of procedure required by law.
Under the "arbitrary and capricious" standard of review of agency action, the reviewing court is to search for clear error of judgment, but it cannot substitute its judgment for that of the agency. American Medical Ass'n v. Mathews, 429 F.Supp. 1179 (D.C.Ill.1977); Montana Power Co. v. Environmental Protection Agcy., 429 F.Supp. 683 (D.Mont.1977); American Federation of Government Emp. v. Hoffmann, 427 F.Supp. 1048 (D.C.Ala.1976). These cases make plain that it is not for the reviewing court to supply its own interpretation so long as the interpretation or determination applied by the agency was reasonable, even though that interpretation might not appear as reasonable as some others. *55 An equally well-settled principle is that in construing administrative regulations, the ultimate criterion is the administrative interpretation which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulations. United States v. Larionoff, 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977). It is for this reason that the courts have uniformly accorded great deference to an agency's interpretation of its own regulation based on the agency's greater expertise in the particular area which is subject to regulation by that agency. Jicarella Apache Tribe v. Federal Energy Regulatory Comm'n, 578 F.2d 289 (10th Cir. 1978). A decision, to be "arbitrary and capricious," must be based on facts not supported by the record; however, factual certainty is not necessary, and an agency may regulate even though facts do not illuminate a clear path. National Citizens Committee for Broadcasting v. FCC, 181 U.S.App.D.C. 1, 555 F.2d 938 (1977), reversed on other grounds, 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697.
Guided by the foregoing principles which emphasize the narrow scope of our review, we proceed to examine the administrative record as follows:
1. On January 29, 1974, pursuant to formal application submitted to HUD, the City of Aberdeen became eligible to participate in the National Flood Insurance Program (NFIP) under the National Flood Insurance Act of 1968, as amended, 42 U.S.C. § 4056. By this administrative action, the land use and control measures submitted by Aberdeen were accepted, pending a detailed examination, in accordance with the applicable federal regulations, 24 C.F.R. 1910.5. The administrator advised that new and existing construction would be permitted to obtain subsidized flood insurance under the emergency program "until the special flood hazard areas are identified. Once the Flood Hazard Boundary Map has been issued, however, subsequent new construction located in special flood hazard areas will not be eligible for flood insurance except at actuarial rates and therefore the owners must await completion of the rate-making study to obtain such insurance." The Administrator further advised: "Once the rate-making study for the area has been completed, the community will be converted to participation in the regular program. Structures that are constructed or substantially improved after the publication of the Flood Hazard Boundary Map and are located within the specifically identified areas of special flood hazards will then be eligible for flood insurance coverage only at full actuarial (or non-subsidized) rates." (Ex. 1, Administrative Record (AR)).
2. The Administrator designated Glenn Woodard as the Consultation Coordination Officer (CCO) for a proposed Flood Insurance Study to be conducted at Aberdeen. This officer was charged with responsibility for seeing that, throughout the study, there would be adequate consultation with elected local officials as required by § 206 of the Flood Disaster Protection Act of 1973. This was contained in a letter from George K. Bernstein to E. Lamar Seals, Regional Administrator dated October 7, 1974. (Ex. 2 AR).
3. On February 26, 1975, Glenn Woodard advised Mayor Tisdale that meetings would be held in Aberdeen on March 4, 1975, to determine the areas of the community to be included in the Flood Insurance Study, and that the CCO would have in attendance a hydraulic engineer to discuss technical aspects of the study. He pointed out that the study would provide technical data on which to base local flood plain management regulations in accordance with National Flood Insurance Program requirements. The CCO requested all knowledgeable officials to attend the meeting and to provide four copies of a base map to be used for delineating areas of study. (Ex. 3 AR).
4. William G. Massey, Flood Insurance Specialist for Region IV, advised Mel Crompton, in charge of engineering and hydrology, on April 1, 1975, that a pre-contract coordination meeting had been held in Aberdeen on March 4, attended by officials of the Federal Insurance Administration, the City, Michael Baker, Jr., Inc. (Baker), which firm had been engaged to conduct a *56 flood elevation study, and others. In this letter Massey pointed out:
The city has some major flood problems caused by the Tombigbee River, which is adjacent to the eastern boundary of the city. This area will be studied in detail. Three streams inside the city limits will also be studied in detail. These areas are all marked in yellow on the enclosed map. Matubba Creek from the Tombigbee River to Meridian Street will be included in the detail study.
(Ex. 4 AR).
5. The Federal Insurance Administrator advised Aberdeen's mayor on August 11, 1975, that Baker had been employed to conduct a flood elevation study for Aberdeen and that the study would entail the development of technical information needed to establish actuarial insurance rates and provide a basis for the adoption of appropriate flood plain management measures. Included in the study would be findings of flood frequency elevations for the areas of the community which have a special flood hazard. The cooperation of the community was solicited, and Baker was directed to contact the individual designated by Aberdeen to implement the National Flood Insurance Program and keep him informed about the progress of the study. It was pointed out that data concerning flood hazards and experiences, plans to avoid potential hazards, and other pertinent information would be useful. The Administrator advised that the study was expected to commence July 24, 1975, and be completed in about 24 months. (Ex. 5 AR).
6. On September 12, 1975, Massey advised Mayor Tisdale that a flood insurance meeting would be held in Aberdeen on September 23, 1975, at which time the community would be informed as to the nature and purpose of the Flood Insurance Study, and community input was solicited to aid the firm of Baker in the development of pertinent data. It was emphasized that Baker would discuss in detail the procedures and methods to be used in this study, the manner in which they would be applied, and the principles to be employed. They were to discuss the particular areas in Aberdeen for study, present examples of completed studies, including the meaning of the term "floodway" and how it would be delineated, if applicable. The Mayor was advised that all flood hazard information of historic nature about past flooding, plans to alleviate potential flooding areas, and other appropriate data would be considered. Massey emphasized that the flood insurance meeting was the initial step to carry the community into the "Regular Phase" of the National Flood Insurance Program. (Ex. 6 AR).
7. On September 30, 1976, Woodard forwarded to Mayor Tisdale a draft Flood Study for Aberdeen, advising that he would be contacted within 30 days to meet for a review and presentation of the report. The Mayor was urged to review the report with local officials, and should additional technical data be considered as part of the study, to make the same known at the review meeting. (Ex. 7 AR).
8. On October 7, 1976, Woodard confirmed that a meeting would be held with Ralph Byars, Utilities Manager of Aberdeen, on October 22 to discuss the results of the flood insurance study prepared by Baker as the contractee of the Federal Insurance Administration. The elected officials of the community and city engineer and/or city planner were urged to be in attendance, "as the study will be the basis which you will use in establishing your flood plain management ordinances in those identified areas." On November 2, 1976, Massey advised Greg Chappell of HUD's Engineering Division that a final consultation coordination meeting was held in Aberdeen on October 22, at which time "the city expressed a great deal of concern over a portion of the floodway of the Tombigbee River. This area is under pressure from developers to fill, as this will be adjacent to the Aberdeen lock on the Tennessee-Tombigbee Waterway and would be prime commercial land. The river channel is to be moved to the east when construction starts on the waterway project and the chances are very good that this area would no longer be in the floodway." (Ex. 8 AR).
*57 9. On December 1, 1976, the Federal Administrator advised Mayor Miller (successor to Mayor Tisdale) of the final coordination meeting held in Aberdeen on October 22 pursuant to the delivery of a preliminary draft of the flood insurance study prepared by HUD's regional representative from Atlanta. He stated this study was prepared pursuant to the provisions of the National Flood Insurance Act of 1968, 42 U.S.C. § 4102, and included proposed determinations of flood elevations. The Mayor was advised that the flood elevations having been determined, the ninety-day period required by the regulations would be commenced, and that public notification was being given in The Aberdeen News Herald, a local newspaper, on December 2 and 9, 1976, and also that a copy of the proposed Flood Elevation Determination would be published in the Federal Register. These actions were taken in accordance with § 110 of the Flood Disaster Protection Act of 1973 (Pub.L. 93-234), which added § 1363 to the National Flood Insurance Act of 1968, 42 U.S.C. §§ 4001-4128 and 24 C.F.R. Part 1917. Copies of the notice and of the regulations were forwarded to the Mayor, who was advised that during the ninety-day period following the second publication in The Aberdeen News Herald any owner or lessee of real property in Aberdeen who believed his property rights to be adversely affected by the proposed flood-elevation determination could appeal to the Mayor or such agency as he may designate. In this communication, the Federal Insurance Administrator advised "the sole basis for such appeals is the possession of knowledge or information indicating that the proposed flood elevation determinations are scientifically or technically incurred." 24 C.F.R. 1917.6. Private persons wishing to appeal were advised to present such data tending to contradict the Administrator's findings, and the City was given an opportunity to present an appeal in its own name or to allow individual appeals of the proposed elevation determinations. The Mayor was further advised that any appeals made would be resolved by consultation with officials of Aberdeen, by administrative hearing, or by submission of conflicting data to an independent scientific body or appropriate federal agency for advice. Finally, the Administrator advised that until the conflict of data is resolved, "and we make a final determination in the Federal Register based on our findings, and so notify the governing body of the community, flood insurance previously available within the community shall continue to be available under the Emergency Program, and no person shall be denied the right to purchase the first level of insurance at chargeable rates." The City was notified that appeals had to be filed with the office of the Federal Administrator not later than March 11, 1977. (Ex. 9 AR).
10. On January 12, 1977, the Federal Insurance Administrator forwarded to Mayor Miller two revised drafts of the Flood Insurance Study and Flood Insurance Rate Maps of Aberdeen. He pointed out that the revised drafts incorporated all appropriate comments at the coordination meeting held October 22, 1976, and that unless changes were made as the result of an appeal, the revised copies would constitute the Flood Insurance Study and Flood Insurance Rate Maps for the City of Aberdeen. The Mayor was again reminded that the ninety-day appeal period expired March 11, 1977. (Ex. 10 AR) (Flood Insurance Study, Ex. 11 AR).
11. On March 9, 1977, the Mayor submitted a consolidated appeal by the City of Aberdeen objecting to the proposed flood elevation determinations and advised that numerous property owners in the City of Aberdeen had petitioned the City to appeal the flood elevation determinations as prepared by Baker, and the City had voted to join in the making of an appeal for the following reasons:
(a) The present construction of a lock and dam in the immediate vicinity of the Tombigbee River to be utilized as an integral part of the Tennessee-Tombigbee Waterway, a structure which had been commenced in December 1976 and was scheduled to be completed by May 1980.
(b) That the Tombigbee River is to be channeled, widened, and dredged in conformity *58 with plans and designs of the United States Corps of Engineers.
(c) That in connection with the Tennessee-Tombigbee Waterway Project, U. S. Highway 45 is to be relocated in the "flood plain" area with new highway construction involving large amounts of field work radically changing the topography in this area. Additionally, a new four-lane highway bridge constructed in accordance with specifications of the Federal Highway Administration is to be built over the Tombigbee River in conjunction with the relocated highway.
(d) That many of the areas designated by Baker as being in the "flood-way" in the vicinity of the Tombigbee River have never been flooded in the history of the City; that these same areas, following the completion of the Tennessee-Tombigbee and relocation of Highway 45, will become highly desirable industrial sites because of their proximity to the waterway, and that the inclusion of this area in the proposed "flood-way" would pose an economic hardship of vast proportions not only upon the City of Aberdeen but upon the owners and lessees of property within the affected area.
The City, as appellant, alleged that the foregoing developments were not considered by Baker in the preparation of the map for flood elevation determinations.
Two other areas included in the proposed flood-way, one being known as the "City Ditch" property and the other as the "James Creek Tributary" property, were said never to have been flooded in the past and their respective elevations greatly exceeded normal flood-prone elevation levels.[3] (Ex. 12 AR).
12. The Federal Administrator on August 1, 1977, advised Mayor Miller of the final flood elevation determination for the City of Aberdeen made in compliance with 24 C.F.R. Part 1917, a regulation requiring notice of final flood elevation be sent to the community's chief executive officer, all individual appellants, and published in the Federal Register. The Administrator advised that all technical data in support of the City's appeal had been evaluated and all appeals resolved in accordance with the applicable regulations. Therefore, the determination of the Administrator as to the base elevations for the community was considered final and would be published in the Federal Register as soon as possible. Copies of the Flood Insurance Study and Flood Insurance Rate Map were included. The FIRM was to become effective six months from the date of this letter. The Administrator pointed out that the Flood Insurance Study establishing the 100-year base flood elevations for Aberdeen had been completed, but that as a condition of continued eligibility in the National Flood Insurance Program, the community would be required to adopt an ordinance in conformity with § 1910.3(d), and that communities that fail to enact the necessary flood plain management regulations would be generally suspended from participation in the program. (Ex. 13 AR).
13. The Federal Administrator on November 1, 1977, advised Mayor Miller that by February 1, 1978, Aberdeen must enact flood plain management measures in accordance with § 1910.3(d) of the program regulations, 24 C.F.R 1909, etc., and that the adoption of these additional measures was essential in order to maintain the community's eligibility in the National Flood Insurance Program. It was emphasized that the failure to adopt such management measures as outlined by the Administrator by February 1, 1978, would result in the suspension in the community's eligibility for participation in the National Flood Insurance Program in accordance with § 1909.24 of the regulations. (Ex. 14 AR).
14. On January 31, 1978, the Secretary of HUD advised Mayor Miller that Aberdeen's eligibility for participation in the National Flood Insurance Program would be suspended on March 1, 1978, if the City did not submit adopted flood management *59 measures which satisfy the requirements of § 1910.3(d) of the program regulations on or before that date. (Ex. 15 AR).
15. HUD's representatives, Cassell and Lindsey, met with the Aberdeen city officials on February 28, 1978, principally to discuss the technical aspects of the City Ditch and James Tributaries 1 and 2. The major point of the meeting involved a discussion of how the flow values were computed, with the FIA study utilizing a method developed by USGS for watersheds less than 5 square miles, and the City utilizing another method, also prepared by USGS and the Mississippi Department of Transportation, that apparently combined the data for 5 square mile watersheds and other watersheds of up to approximately 6000 square miles. The Federal Administrator agreed to review the two methods and to contact the city engineer to coordinate the results after the review. On the night of February 28, 1978, the Mayor and Board of Aldermen adopted an ordinance meeting the required standards of § 1910.3(d). (Ex. 18 AR).
16. Honorable D. W. Houston III, City Attorney of Aberdeen, on March 1, 1978, advised the FIA that the Mayor and Board of Aldermen unanimously adopted the flood management ordinance and that also as a result of the meeting between Lindsey of FIA and representatives of Baker, some inaccuracies in the criteria used in promulgating the floodway and flood boundary map of Aberdeen were hopefully resolved. The city attorney advised that it was anticipated that "we will be able to see some relief in the floodway delineations along the City drainage ditch, as well as, the two small tributaries which come into residential areas." This letter concluded by Mr. Houston stating that the City was grateful "for your continuing commitment to see that we will be operating under accurate flood boundary designations . . . after the construction of the Tennessee-Tombigbee Waterway and U. S. Highway 45." (Ex. 19 AR).
17. The floodway was delineated by flood boundary and floodway map based upon 100-year experience and also 500-year historical data, as well as Flood Insurance Rate Map effective February 1, 1978. (Ex. 20 AR).
18. Representatives of HUD's engineers on August 29, 1978, advised Mayor Miller that they had evaluated the technical data and completed modifications to the Flood Insurance Study and the Flood Insurance Rate Map; and they enclosed two revised copies of each map for the community. The letter continued: "If you have any additional scientific or technical data pertaining to the hydraulics or hydrology of the special flood hazard areas (Zone A), or to the extent of land inundation shown for the rated zone areas (Zones A1-30) that might justify modifying our results, please use one (1) copy of the enclosed map to identify the area of concern and return it to us within 21 days from the date of this letter. If you should find no conflict with the map, please return one copy of the map with a letter stating you have reviewed the accompanying material." (Ex. 23 AR).
No further communications were received. Thereafter, this suit seeking administrative review was filed.
On the basis of the foregoing review of the administrative record, it is clear to the court that all legal steps required by the federal statutes and regulations on the subject of the National Flood Insurance Program were complied with and that the City officials were given ample opportunity to participate in the determination of the flood plain designations developed for the City of Aberdeen. In several respects, such as the City Ditch and James Tributaries, the City's objections were incorporated in the final designation. The crux of the case is whether the flood plain designation was rendered inaccurate by the failure of the federal officials to take into account potential changes in the Tombigbee River in connection with the construction of the lock and dam at Aberdeen, the channeling, widening and dredging of the Tennessee-Tombigbee Waterway Project, as well as the relocation of U. S. Highway 45 and the construction of a new 4-lane bridge over the Tombigbee *60 River in connection with the relocated highway. The record shows that these points were considered by the federal officials, but absent any historical data upon which to make judgments of flood elevations by reason of such changes, they were not taken into account and were eliminated from the study made by Baker. The exclusion of these factors by Baker was upheld by the Federal Administrator after full consideration. Needless to say, the concerns in these areas expressed by the plaintiff Roberts as well as by other property owners in the City of Aberdeen cannot be documented in any way with historical data to justify the conclusion that the federal officials acted arbitrarily and capriciously in not considering the current construction in designating the floodway applicable to the City of Aberdeen. The plain fact is that the structures being carried out to complete the Tennessee-Tombigbee Waterway Project do not constitute past knowledge or information that the flood elevations proposed by the Federal Administrator are scientifically or technically incorrect. It is precisely this type of information which is required under 24 C.F.R. 1917.6 and 42 U.S.C. § 4104(b) in order to make a necessary showing that the federal officials have acted in an arbitrary or capricious manner or have committed an abuse of discretion. Plaintiff Roberts has failed to tender an issue of fact that at the present time, or at the time of the adoption of the federal flood control plan, there was a failure to consider all historical information affecting the proper development of an accurate flood control plan.
Upon the completion of the Tennessee-Tombigbee Waterway Project in the area of Aberdeen with the construction of the lock and dam, the channeling and dredging of the waterway, the relocation of U. S. Highway 45, and the completion of a 4-lane bridge across the Tombigbee River, it may well be that certain areas presently included in the floodway should be removed therefrom because of altered conditions. The City of Aberdeen has the word of the FIA that if such changes justify alterations of the pertinent flood plan, necessary action will be taken. For, indeed, the program's regulations specifically require that where a community's base flood elevations may either increase or decrease resulting from physical changes affecting flooding conditions, the Administrator is directed to accumulate additional technical or scientific data in accordance with 24 C.F.R. 1915.5 et seq. In such case, the submission of the additional data is "necessary so that confirmation of those physical changes affecting flood conditions, risks, permanent rates and flood plain management requirements will be based upon current data."
It necessarily follows that since neither engineers nor courts can anticipate, or forecast with reasonable accuracy, the flooding effects, whether beneficial or detrimental, of the changes occurring at Aberdeen as a consequence of the completed Tennessee-Tombigbee Waterway, we are unable to say that HUD's administrative decision, based on the known historical flood data, is arbitrary and capricious, an abuse of discretion, or an act contrary to law. On the contrary, the procedural steps required by statute and applicable regulations were followed with meticulous care. It would, in our opinion, be reversible error for us not to affirm the agency decision made in this case.
In our prior order denying the federal defendants summary judgment on this issue, we failed to take into account that the determination of flood plans in the administration of the National Flood Insurance Program must be based exclusively upon historical data or past events and that the regulations provide a remedy, should historical data prove to be inaccurate or otherwise misleading, to correct whatever injury may have resulted from the original determination.
Since there is no genuine issue of fact raised by the administrative record as to error committed by the federal officials in the application of the administration of the National Flood Insurance Program, the federal officials are entitled to summary judgment in their favor.
*61 The federal officials being dismissed from this case, the remaining defendants, namely, the Mayor and Board of Aldermen of the City of Aberdeen, Mississippi, and the Chairman and Commissioners of the Mississippi State Highway Commission and the State of Mississippi, are likewise finally dismissed as defendants.
Let an order be entered finally dismissing the complaint with prejudice.
NOTES
[1] The court has heretofore granted partial summary judgment in favor of the City of Aberdeen, the members of the Mississippi State Highway Commission, as well as the federal defendants, upholding the constitutionality of the National Flood Insurance Program and rejecting plaintiff's claim that the program violated his right to due process of law under the fifth and fourteenth amendments to the United States Constitution. By this order, the court effectually eliminated from the case all parties defendant other than the federal defendants.
[2] § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall 
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be 
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.
[3] These two objections were subsequently taken into consideration by the federal defendants in the final draft of the FIRM. City Ditch and James Creek Tributaries 1 and 2 were taken into the revised base flood elevations and floodways. (See Ex. 21 and 22 AR).