949 F.2d 405
 292 U.S.App.D.C. 230
 RAINBOW BROADCASTING COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Press Television Corporation, Brevard Community College, Intervenors.
 No. 90-1591.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 30, 1991.
Decided Nov. 8, 1991.
 
 Petition for Review of an Order of the Federal Communications Commission.
 [292 U.S.App.D.C. 231] Katrina Renouf, with whom Margot Polivy, Washington, D.C., was on the brief, for petitioner.
 Sue Ann Kanter, Counsel, F.C.C., with whom Robert L. Pettit, General Counsel, and Daniel M. Armstrong, Associate General Counsel, F.C.C., and John J. Powers, III, Atty., Dept. of Justice, Washington, D.C., were on the brief, for respondents. C. Grey Pash, Jr., and Jane E. Mago, Counsel, F.C.C., and Marion L. Jetton, Atty., Dept. of Justice, Washington, D.C., also entered appearances for respondents.
 Harry F. Cole, Washington, D.C., was on the joint brief for intervenors Press Television Corp. and Brevard Community College. Richard J. Bodorff and Jonathan W. Emord, Washington, D.C., also entered appearances for intervenor Brevard Community College.
 Before MIKVA, Chief Judge, and SENTELLE and HENDERSON, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SENTELLE.
 SENTELLE, Circuit Judge:
 
 
 1
 Rainbow Broadcasting Company ("Rainbow"), holder of a construction permit to build a television station on Channel 65 in Orlando, Florida, seeks review of a Federal Communications Commission ("FCC" or "Commission") policy allowing commercial and noncommercial television licensees to exchange channels without exposing the licensees to competing applications. Rainbow also seeks review of two FCC orders that approved a channel exchange between two channels near Orlando, Florida, and denied Rainbow the right to compete for the resulting allocation of the commercial frequency.
 
 
 2
 We hold that the FCC was within its authority when it formulated the policy and properly applied the policy in the two rulings.
 
 I. BACKGROUND
 
 3
 Pursuant to its authority under two provisions of the Communications Act, 47 U.S.C. §§ 309 & 316, the FCC issued a rule in 1986 entitled Amendments to the Television Table of Assignments to Change Noncommercial Educational Reservations, 59 Rad.Reg.2d (P & F) 1455 (1986), recon. denied, 3 F.C.C.R. 2517 (1988) ("Policy"). The Policy allowed the licensee of a commercial channel and the licensee of a reserved noncommercial educational channel within the same band and serving substantially the same market to jointly petition for an amendment to the table of assignments exchanging those channels "upon a finding that such action will promote the public interest, convenience, and necessity." 47 C.F.R. § 1.420(h). Stating that it adopted the Policy as a rescue effort for educational broadcasting in the wake of decreases in federal funding, the FCC designed the Policy to facilitate channel exchanges between commercial and noncommercial stations in which funding flowed from the commercial to the noncommercial parties.
 
 
 4
 In 1982, Glorious Church of God in Christ, Inc., obtained a construction permit to build a television station in Cocoa, Florida, for educational Channel[1] In April 1986, Glorious Church still had not completed the construction, and New Visions of Florida Broadcasting, Inc., a nonprofit corporation, bought from Glorious Church an option to purchase Channel once construction was completed and broadcasting begun. In September 1985, Press Television Corporation ("Press") became the licensee of Channel 43, Melbourne, Florida. Press desired to undertake a channel exchange with Glorious Church, but for channel separation reasons, Channel 43 could not be relocated in a fashion necessary to make the swap feasible. Therefore, Press purchased from Glorious Church in December 1986 an exclusive option to swap channels once Press obtained an eligible channel with which to swap, notwithstanding the New Visions option to purchase Channel [292 U.S.App.D.C. 232] after commencement of broadcast operations.
 
 
 5
 In an effort to obtain an eligible channel, Press acquired the construction permit for Channel 68 in Clermont, and began broadcasting on this channel from a tower site that lacked the capacity to reach the entire Orlando market. The FCC and Press characterize Press's efforts to secure a channel exchange with Glorious Church as a remedy to this limitation on the range of broadcast.
 
 
 6
 Meanwhile, Glorious Church completed construction of its Channel facility in June, 1987. At that time, although Press was not qualified to operate an educational station, Press bought the purchase option from New Visions, with the proviso that Press would assign it to a third party who was qualified to operate an educational station. Press entered into an agreement with Brevard Community College ("BCC") to fund its entry into the educational broadcasting field. Press assigned BCC the purchase option, paid BCC $300,000 to purchase Channel from Glorious Church, promised $1,000,000 for construction and operation on Channel 68 once the exchange was approved, and added a monthly operating stipend for two years amounting to $240,000 and equipment valued at $200,000.
 
 
 7
 Press and BCC petitioned for an FCC rulemaking to exchange channel frequencies. The Mass Media Bureau issued a Notice of Proposed Rule Making on March 23, 1989. In it the Bureau expressed concerns about Press's broadcast capacity, questioning whether Press could put a required grade of signal over the city of Clermont from the Channel location. The Bureau accepted technical data acquired by a methodology described by Rainbow as "nonstandard." The data supported Press's ability to achieve the required grade. No participants, including Rainbow, supplied contradicting data.[2] In addition, the Bureau concluded that Clermont, 25 miles west of Orlando, and Cocoa, 45 miles southeast of Orlando, were in "substantially the same market," and thus satisfied this requirement of the exchange Policy. Finally, the Bureau adopted an Order authorizing the channel exchange arranged by Press and BCC, Report and Order, 4 F.C.C.R. 8320, 8323 (Mass Media Bureau 1989).
 
 
 8
 Rainbow petitioned the Commission for review of the Bureau's Order, claiming the right to compete with Press for the chance to benefit from a swap with BCC. Rainbow asserted three grounds for nullifying the Order: (1) that Press assumed control of the noncommercial station with which it swapped before negotiations for the swap began; (2) that the swap did not benefit the public interest; and (3) that the channels swapped were not located within the same market, as required by the Policy.
 
 
 9
 As to the first ground, Rainbow contended that Press, by acquiring New Visions, assumed financial control of the Channel option in violation of 47 U.S.C. § 310(d), which prohibits transfers of control without FCC approval. In its Order affirming the Bureau's approval of the swap and denying Rainbow's application for review of the Bureau Order, the FCC rejected Rainbow's first assertion by declaring:
 
 
 10
 Options and related agreements concerning the future ownership or control of a broadcast station do not raise a prima facie case that a transfer of control has occurred. Our only requirements pertaining to such agreements are that they be filed in accordance with Section 73.3613 [292 U.S.App.D.C. 233] of the Rules, and not be implemented without prior Commission approval.
 
 
 11
 Memorandum Opinion and Order, 5 F.C.C.R. 6566 (1990).
 
 
 12
 Next, the FCC found no merit in Rainbow's contention that the swap did not benefit the public interest, adopting the Bureau's finding that BCC would "receive financial assistance from Press that will enable BCC to improve its facilities, thereby increasing the population within the WRES Grade B service area from 165,118 people to 1,014,972 people, and providing first noncommercial educational television service to 18,341 people. Furthermore, Press will be able to change the technical facilities for its station, thereby providing a WKCF Grade B service to 1,396,543 people." Report and Order, 4 F.C.C.R. at 8322. The FCC also concurred with the Bureau's determination that Press and BCC were located in substantially the same market, and that they had not changed their community of license, another requirement in the Policy. Finally, the FCC made a general public interest finding. Rainbow petitions this Court for review.
 
 II. DISCUSSION
 
 13
 On petition to this Court, Rainbow repeats the attacks it made before the FCC regarding the Press-BCC swap and adds what appears to be the first court challenge to the five-year-old Policy allowing channel exchanges. Rainbow argues that the Policy is "unlawful" and "without rational basis." It asserts that the "policy rests on a reading of Section 316 which is impermissible on its face and which nullifies both the comparative licensing scheme of Section 309 and the Ashbacker doctrine." In support of its contention that the FCC's reading is "impermissible," Rainbow asserts that the channel exchange Policy stifles competition, represents an unreasoned departure from a past Commission reading of Ashbacker Radio Co. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), and does not promote the public interest.
 
 A. The Policy
 1. Competition
 
 14
 Rainbow's argument that the Policy should be reconsidered because it stifles competition fails for two reasons. First, the Policy need not promote competition to be lawful. In Central Florida Enterprises, Inc. v. FCC, 683 F.2d 503 (D.C.Cir.1982), this Court condoned FCC deference to incumbent channels up for license renewal against competitive bidders. We held that inhibiting competition is permissible, if done "for the benefit of the public, not for incumbent broadcasters." Id. at 507.
 
 
 15
 Second, notwithstanding the lack of any overriding mandate to foster competition, the channel exchange Policy allows room for competition. Under the Policy, educational stations are not required to take the first swap bid they receive. They may pick and choose before they bring their proposed swap to the FCC. Furthermore, the 1986 Policy may be seen as a move by the FCC toward subjecting the allotment of television channels to market conditions even after parties decide to submit proposals to the FCC for approval. The Policy promises to implement the will of private parties, with minimal imposition of FCC requirements. Private parties, rather than the FCC, initiate the exchange. And the FCC defers " 'to determinations reached by directors of public stations.' " 59 Rad.Reg.2d (P & F) at 1464(a).
 
 2. Change in Policy
 
 16
 As to Rainbow's assertion that the Policy constitutes an impermissible change in the Commission's interpretation of the Ashbacker policy, we note at the outset that the Commission possesses the authority to change its policies and interpretations of law, so long as it provides reasoned explanation. National Association for Better Broadcasting v. FCC, 849 F.2d 665, 669 (D.C.Cir.1988). It may not, of course, run afoul of definitive pronouncements of the Supreme Court as to the meaning of statutory provisions, but it has not done so in this case. The so-called "Ashbacker doctrine" arises from a decision in which the [292 U.S.App.D.C. 234] High Court required the FCC to hold hearings to compare competing applications for free channel space. The Court held that when the Commission received mutually exclusive applications for an open frequency from two or more qualified applicants, it must treat them equally; it cannot grant one application and require the others to compete against an "incumbent." 326 U.S. at 330-33, 66 S.Ct. at 149-51. But the Ashbacker Court did not address the issue of what circumstances create an "open" frequency triggering the competition requirement. Particularly, the Court never said that the Commission must open a frequency for competing applications whenever it assigns that frequency to a community.
 
 
 17
 While the Commission has expressed the view that the public interest is best served by open competition for frequencies allotted to a community, see, e.g., San Francisco, Notice of Rulemaking, 67 F.C.C.2d at 243; Riverside-Santa Anna, 65 F.C.C.2d at 923-24; Cheyenne, 62 F.C.C.2d at 67-68, in the intraband exchange Policy, the Commission determined with reasoned explanation that this view does not apply in the context of channel exchanges. In adopting the Policy, the Commission expressed an awareness of the difficulties facing many noncommercial stations in financing the construction of improvements in operations, particularly in light of the reduction of federal funding for noncommercial broadcasting. The Commission expressed the belief that commercial stations seeking a channel exchange could be a source of funds for noncommercial stations, and recognized that in individual cases, channel exchanges could promote spectrum efficiency and provide improved service to the public. 59 Rad.Reg.2d (P & F) at 1457, 1461.[3]
 
 
 18
 Agencies enjoy wide latitude when using rulemaking to change their own policies and the manner by which their policies are implemented. In FCC v. National Citizens Comm. for Broadcasting, for example, the Supreme Court held that the FCC properly departed from a previous pattern of licensing decisions. 436 U.S. 775, 796-97, 98 S.Ct. 2096, 2112-13, 56 L.Ed.2d 697 (1978). According agencies the power to change their minds about their own policies, practices and procedures rests on a sound policy basis. Agencies need some flexibility in carrying out their authority. This is particularly true of the FCC. Technological, commercial, and societal aspects of the television industry are in constant flux:
 
 
 19
 Underlying the whole [Communications Act] is recognition of the rapidly fluctuating factors characteristic of the evolution of broadcasting and of the corresponding requirement that the administrative process possess sufficient flexibility to adjust itself to these factors.
 
 
 20
 FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 138, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940). The FCC defends the Policy as a response to the reduction of federal funding of educational programming. And Congress itself set the tone for the encouragement of alternative funding sources. See Omnibus Budget Reconciliation Act, Pub.L. No. 97-35, §§ 1230-33, 95 Stat. 357, 730-36 (1981); codified at 47 U.S.C. §§ 399A, 399B; HOUSE COMM. ON ENERGY AND COMMERCE, Public Broadcasting Amendments Act of 1981, H.R.Rep. No. 82, 97th Cong., 1st Sess. 7 (1981).
 
 3. Rational Basis
 
 21
 The Policy does not lack a "rational" grounding in statute or in regulatory objective. The FCC bases its authority to create the Policy in its enabling statute. Furthermore, the Policy states its objective, promotion of the public interest, and supplies an explanation of how the Policy furthers the objective. Finally, the objective itself lies at the heart of the FCC's mandate. See 47 U.S.C. § 303(r).
 
 
 22
 [292 U.S.App.D.C. 235] The FCC derives from 47 U.S.C. §§ 309 and 316 of the Communications Act its authority to approve channel exchanges and protect them from competitive bidding. 59 Rad.Reg.2d (P & F) at 1455-63. Section 309 imposes on the FCC the obligation to hold hearings to compare competing bids for applications for grant, renewal, or modification of television channel licenses, but only when the station owners themselves initiate the change, and where "a substantial and material question of fact is presented or the Commission for any reason is unable to make the finding" that granting the application serves "the public interest, convenience, and necessity." 47 U.S.C. § 309(a). Congress broadened the FCC's discretion in § 316, which provides the FCC with the authority to modify licenses without the approval of their holders. This authority for the first time allowed the FCC to take the initiative in modifying licenses, as a supplement to its § 308 authority to grant, renew, and modify licenses in response to applications.
 
 
 23
 Taken together, §§ 309 and 316 provide a basis for the channel exchange policy that we cannot declare irrational. As explained in the Conference Report accompanying the 1983 amendment of § 316, Congress further broadened the FCC's power to approve exchanges by extending it to applications for licenses and permit holders who aimed to expand their broadcast capability. H.R.Rep. No. 356, 98th Cong., 1st Sess. 15 (1983), reprinted in 1983 U.S.C.C.A.N. 2219, 2232. And § 309 allows the FCC to approve privately initiated license renewals and modifications subject only to scrutiny into their contribution to the public interest.
 
 
 24
 The Policy statement was a proper exercise of the FCC authority delegated to it by Congress to further the public interest. Far from being an arbitrary and capricious departure from its delegated authority, the Policy represents an effort by the FCC to promote educational television by making it easier for educational channels to raise cash by trading in on their valuable channel positions. Change is not indicative of arbitrary and capricious action if the FCC can show a reason for the change. The FCC gives a reason for its change of practice: in order to encourage channel swaps, the FCC found, from twenty-six years of actual practice, that it had to do more than simply permit the swaps. The Policy reasons that the language of Ashbacker does not require hearings for applications for channels made available through exchange agreements. Congress delegated to the FCC the authority to deny the eligibility of applicants for television licenses where such denial serves the public interest, and the FCC pointed to this authority in the Policy to justify the change in its interpretation of Ashbacker. See 59 Rad.Reg.2d (P & F) at 1457-63. It is reasonable that Ashbacker does not compel the FCC to hold comparative hearings in order to approve channel exchanges, as Ashbacker does not define "open channel," much less include within the meaning of "open channel" those channels up for exchange.
 
 
 25
 The FCC is on firm ground when it argues that the Supreme Court has validated broad parameters within which the FCC may further its view of the public interest without interference from the courts. FCC v. WNCN Listeners Guild, 450 U.S. 582, 594, 596, 101 S.Ct. 1266, 1274, 1275, 67 L.Ed.2d 521 (1981). The Supreme Court has held that Congress delegated to the FCC the task of making the initial determination of how its policies may best serve the public interest. FCC v. National Citizens Comm. for Broadcasting, 436 U.S. 775, 810, 98 S.Ct. 2096, 2119-20, 56 L.Ed.2d 697 (1978).
 
 
 26
 The Policy is consistent with a longstanding FCC posture toward educational television. At the initial allocation of channel space in 1952, the FCC set aside for itself special discretion in handling the allocation of channel space to educational stations. See Table of Allotments, 41 F.C.C. 148, 159, 161 (1952) (codified at 47 C.F.R. §§ 73.606(a), 73.621). In recognition of the public benefit of the operation of noncommercial stations, the FCC has since 1952 followed a pattern of insulating educational stations from market pressures.
 
 
 27
 A principal justification for the Policy is that exposing channel swaps to de novo [292 U.S.App.D.C. 236] evaluation of the qualifications of commercial stations discourages swaps. It is a logical rationale, though there is to date little empirical support. The FCC does cite one example of the dysfunctional nature of its pre-1986 interpretation of its authority to encourage channel exchanges. In Tulsa, 53 Rad.Reg.2d (P & F) 1366, 1369 (1983), a party to a potential exchange withdrew its bid "as soon as another party expressed interest in applying for one of the channels." The minimal evidence brought to light here and in the 1986 Policy supports the FCC position. The 1989 Order challenged here is only the second FCC approval of a channel exchange in the five years since the Policy was issued. Rainbow mentions that only three exchanges took place in the twenty-six years of the former policy. The post-1986 rate of one every 2.5 years compares favorably with a previous rate of one every 8.7 years.
 
 
 28
 The Supreme Court has stated that "complete factual support in the record for the [Federal Communications] Commission's judgment or prediction is not possible or required." National Citizens Comm. for Broadcasting, 436 U.S. at 814, 98 S.Ct. at 2121. There the Court deemed evidence supporting an FCC rationale difficult to compile because it involved a forecast and the imposition of a prospective ban. Though the justification for an FCC decision to create a policy lacked empirical support, the Court deferred to the FCC's judgment and concluded that the record need not provide "complete" factual support. Id. at 796-97, 809-15, 98 S.Ct. at 2112-13, 2119-22. See also Communications Invest. Corp. v. FCC, 641 F.2d 954, 969 (D.C.Cir.1981). In a similar fashion we defer to the FCC explanations, and we uphold the Policy.
 
 B. The Exchange
 
 29
 Nor can we conclude that the FCC review and approval of the Press-BCC swap misapplied the Policy. Further inquiry into the facts behind Press's control over BCC, into the technical capabilities of Press to service the Orlando area, and into the public interest benefits of the exchange, is not necessary for us to reach our determination. Congress in § 309(e) requires the FCC to hold a hearing to inquire into the merits when "a substantial and material question of fact" requiring further inquiry arises. The FCC found below that no substantial or material question remained. We will not here order the FCC to conduct a hearing to inquire further into the merits of the application, as we did in Astroline, where a "substantial and material question of fact" remained. Astroline Communications Co. Ltd. Partnership v. FCC, 857 F.2d 1556, 1561-1562 (D.C.Cir.1988). This Court interprets "substantial" to necessitate an evidentiary hearing only if "the totality of the evidence arouses a sufficient doubt on the point that further inquiry is called for." Citizens for Jazz on WRVR v. FCC, 775 F.2d 392, 395 (D.C.Cir.1985).
 
 1. Control
 
 30
 The totality of evidence in the record presents ample evidence that the FCC looked into the control issue at both levels below in sufficient depth to quell any reasonable doubt about Press's control of BCC. First, in the Notice of Proposed Rule Making, 4 F.C.C.R. 2215 (1989), the Commission requested comments on the possibility of Press's control of BCC. Second, in the Commission's reply to the comments, it noted that "we requested BCC's assurance that any proceeds of the exchange would be devoted exclusively to activities related to the operation of the noncommercial television station." BCC provided that assurance. Report and Order, 4 F.C.C.R. at 8321. Third, allegations that Press's funding of the noncommercial station, BCC's use of the transmitter site licensed to Press, and Press's sole prosecution of the exchange petition, all raised the question of Press's control of the station. The Commission heard Press's reply that it disclosed to both the FCC and to the public all its arrangements with BCC, and that Press did at no time control the construction permit for the noncommercial station. Id. at 8322.
 
 
 31
 The record shows no convincing evidence that Press acquired control of BCC before [292 U.S.App.D.C. 237] or during the swap. The FCC defines control in this provision as "final authority over the station's personnel, programming and finances." Southwest Texas Public Broadcasting Council, 85 F.C.C.2d 713, 715 (1981) (emphasis added). At most, the evidence in the record showing Press's financial underwriting of the BCC operation in part satisfies only one of three aspects of the control prohibited by the FCC. The record shows nothing about Press's relationship to the personnel and programming of BCC, except that Press plans to fund an internship program at BCC that would develop public policy programs for both BCC and Press.
 
 
 32
 Congress saw the problem of improper channel and station control vital enough to enact 47 U.S.C. § 310(d), which provides:
 
 
 33
 No construction permit or station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby.
 
 
 34
 47 U.S.C. § 310(d), as amended. Accordingly, one of the FCC's requirements of channel exchanges is that the exchanging channels remain under separate control. Commercial channels may buy off the channels competing to be parties to the exchange, but they may not buy the noncommercial station with which they are exchanging channels. To ensure the continued separation of identity of the exchanging channels, the FCC properly placed a requirement on its own treatment of channel exchanges: it must scrutinize the merits of each exchange application. This scrutiny is supposed to afford "ample opportunity" for opponents to show that the commercial station bought the noncommercial station in "good faith." 59 Rad.Reg.2d (P & F) at 1464a.
 
 
 35
 For its part, Rainbow fails to be specific about why the negotiations before the exchange agreement violate § 310(d). Rainbow alleges unconvincingly that a succession of option holders constitutes a violation of the Policy's prohibition of any transfer of control before FCC approval "because it is not the result of good faith arms [sic] length negotiations." Petitioner's Brief at 14. Rainbow adds the "arm's length" language and asserts, without pointing to any statutory language or legislative history, that "demonstration of good faith arms [sic] length negotiations is the keystone of the Commission's policy." Petitioner's Brief at 20. Not only does this argument lack support, it cuts against the core of Rainbow's attack against the FCC Policy. Here, Rainbow objects to the very free market, competitive activity that it claims should be encouraged by a change in the Policy. The record shows that any jockeying for position was conducted by assenting parties. In the competitive world that Rainbow favors, channels can buy options and buy off their competitors before any channel exchange takes place. Nor are educational stations required to take the first bid for an exchange that they receive. By approving this swap, the FCC demonstrates that its Policy does not preclude the highest bid from reaching an educational channel before it agrees to a swap with a commercial channel.
 
 2. Technical Capabilities
 
 36
 Rainbow alleges that Press's technical capabilities fall short of providing the required coverage. This is one of those "highly technical questions" to which this Court "must show considerable deference to an agency's expertise." MCI Cellular Telephone Co. v. FCC, 738 F.2d 1322, 1333 (D.C.Cir.1984). Accordingly, we attach significant weight to the FCC's determination that Press's coverage will be adequate. The Commission's record evidences ample support for its conclusions. See supra footnote 2 and accompanying text.
 
 3. Public Interest
 
 37
 We conclude that the FCC properly determined that the exchange of channels between Press and BCC serves the public interest. The cash that Press infused into BCC allows an educational channel to operate [292 U.S.App.D.C. 238] where it otherwise would not have. Cash infusion is stated in the Policy to be one way to promote the public interest, and the Policy does not require that exchanges promote the public interest in more than one way.
 
 III. CONCLUSION
 
 38
 For the reasons set forth above, we conclude that the channel exchange policy is a proper exercise of FCC authority. Furthermore, we uphold the FCC orders of November 28, 1989 and November 9, 1990. We therefore hold that Rainbow's petition for review is
 
 
 39
 Denied.
 
 
 
 [1]
 The Commission designates channels reserved for noncommercial use by placing an asterisk (*) next to the channel number. See 47 C.F.R. § 73.606(a)
 
 
 [2]
 Press used a terrain roughness correction factor supported by field strength measurements to demonstrate that it could place a city grade signal over Clermont from the Channel site. Rainbow did offer evidence to contradict this in the comments it submitted in response to the FCC Notice of Proposed Rule Making released March 23, 1989. It submitted, in an engineering statement, the findings of an engineer who claimed to have personally calculated the measurements submitted by Press and BCC. Since the engineer did not supply to the FCC his data and methodology for FCC verification, the FCC rejected his statement as evidence of Press's inability to achieve Grade B or better coverage. Engineering Statement by Jules Cohen & Associates, attached to "Comments of Rainbow Broadcasting Company to the Chief of the FCC Allocations Branch," May 15, 1989
 
 
 [3]
 The Policy departed from two additional FCC practices. The Policy eliminated the territorial limitation on exchanges to a single community, provided the stations remain licensed in their present locations. Also, whereas before 1986 the FCC initiated the exchanges under 47 U.S.C. § 316, the Policy extended the initiative to private parties. Policy, 59 Rad.Reg.2d (P & F) at 1456
 
 
 *
 See 952 F.2d 1173